**MICHAEL J. BELLEAU,**

     Plaintiff,

vs.                                         Case No. 12-cv-1198 (WCG)

**EDWARD F. WALL,** *et al.*,

     Defendants.

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

     The Defendants require Plaintiff Michael Belleau to wear a device on his ankle that uses global positioning system ("GPS") technology to closely track his every move, every minute of every day for the rest of his life. The device transmits information on Mr. Belleau's location to the Wisconsin Department of Corrections ("DOC"), where staff members review his daily movements. Mr. Belleau, unlike other similarly situated offenders, can *never*, even if he proves that tracking him is not necessary for public safety, end this egregious intrusion on his privacy. Because this tracking punishes him for conduct that took place before the GPS tracking law was enacted, it violates the Ex Post Facto Clause. Because it constitutes an unreasonable search and seizure, it violates the Fourth Amendment. Because it discriminates against certain categories of offenders without sufficient justification, it violates the Equal Protection Clause.

### FACTS

     Mr. Belleau is seventy-two years old. (Pltf.'s Stmt. of Proposed Material Facts ("PFOF") ¶ 1.)  He was charged in 1991 and convicted in January 1992 of second degree sexual assault of a child for conduct occurring in 1987, and was placed on probation. He was discharged from his

sentence by the DOC on January 10, 1997. In 1994, he was charged with and convicted of first degree sexual assault of a child for conduct occurring in 1988 and 1989. He was sentenced to ten years in state prison for the 1994 conviction, but was paroled in 2000. His parole was revoked in October 2001. He was discharged from his sentence on January 3, 2005. (PFOF ¶ 2.)

In 2003, before Mr. Belleau was scheduled to be released from prison, the State of Wisconsin filed a petition in Brown County Circuit Court seeking to have him committed as a "sexually violent person" under Wis. Stat. § 980.02. The petition was granted on September 15, 2004, and Mr. Belleau was committed to the Sand Ridge Secure Treatment Center, operated by the Wisconsin Department of Health Services ("DHS"). (Joint Stipulations ("Stip.") ¶ 28.)

In 2006, seventeen years after the conduct leading to Mr. Belleau's most recent conviction for a sexual offense and one year after he was completely discharged from his criminal sentence, Wisconsin enacted 2005 Wis. Act 431, which created the GPS monitoring and tracking law, codified at Wis. Stat. § 301.48. (Stip. ¶ 29.)

The GPS tracking and monitoring law establishes a "continuing global positioning tracking system to electronically monitor the whereabouts of persons who are subject" to the law. (Stip. ¶ 30 & Wis. Stat. § 301.48(3)(a).) GPS tracking is defined as "tracking using a system that actively monitors and identifies a person's location and timely reports or records the person's presence near or at a crime scene." Wis. Stat. § 301.48(1)(b). The GPS tracking and monitoring law provides that a person, such as Mr. Belleau, who is discharged from civil commitment by a court under Wis. Stat. § 980.09(4) is subject to lifetime GPS monitoring. (Stip. ¶ 31 & Wis. Stat. § 301.48(2)(b)2.)

In February 2009 and again in February 2010, Richard Elwood, Ph.D., a psychologist employed by Sand Ridge Secure Treatment Center, using a combination of actuarial and other

risk assessment methods, determined that Mr. Belleau was not more likely than not to commit a sexually violent act if released and thus concluded that Mr. Belleau did not qualify as a "sexually violent person" subject to civil commitment under Ch. 980 of the Wisconsin Statutes. (Stip. ¶ 41, PFOF ¶ 9.)

Indeed, Dr. Elwood, who was designated an expert witness by the defendants in this case, and who has done more than 250 sex-offender risk evaluations, testified at his deposition that, in his professional opinion, Mr. Belleau did not meet the criteria for civil commitment under Ch. 980, even at the time of his commitment in 2004. (PFOF ¶ 10.) At the time of Dr. Elwood's evaluations in 2009 and 2010, Mr. Belleau's actuarial risk score of zero was "exceptionally low" and placed him among the two or so lowest risk offenders he had ever evaluated. (PFOF ¶ 11.) Dr. Elwood also testified about research demonstrating that an offender's risk of reoffending continues to decline with age and with years in the community without offending, so that Mr. Belleau likely currently poses about half of the "exceptionally low" risk of reoffense he posed when he was released in 2010. (PFOF ¶ 12.) Dr. Elwood indicated that none of the individuals who have been released from Ch. 980 confinement based on his opinion that the person was not a sexually violent person have been arrested for or convicted of a subsequent sexual offense. (PFOF ¶ 13.) And Mr. Belleau is, according to Dr. Elwood, "lower risk than the – even the average of those I recommended for discharge." (*Id.*) Mr. Belleau has not committed or attempted to commit a sex crime, has not been arrested for or charged with a sex crime, and has not been convicted of a sex crime since his discharge and release from Ch. 980 confinement on July 7, 2010. (PFOF ¶ 40.)

On July 2, 2010, in Brown County, the State of Wisconsin stipulated in *State v. Belleau*, No. 2003CI002, that: (1) it could not meet its burden to demonstrate that Mr. Belleau was a

sexually violent person, and (2) supervised release was inapplicable. (Stip. ¶ 42.) As a result, in an order signed on July 2, 2010, but filed on July 6, 2010, the Brown County Circuit Court found insufficient grounds to believe Mr. Belleau is a sexually violent person, concluded that he did not meet the criteria for supervised release, and accordingly discharged Mr. Belleau from his commitment under Wis. Stat. § 980.09(4). (PFOF ¶ 14.) The discharge was made effective July 7, 2010, to allow the DOC "to arrange GPS monitoring, set-up and compliance" after the Independence Day holiday. (*Id.* ("Due to the timing of the Holiday weekend and the need to arrange GPS monitoring, set-up and compliance, the State asks that the Discharge be effective July 7, 2010.")).

On July 7, 2010, at the Brown County jail, where he had been detained since July 2, so that DOC could begin GPS tracking, an agent of DOC attached a GPS monitoring and tracking device to Mr. Belleau's ankle. (PFOF ¶ 15.) Jail personnel initially released Mr. Belleau to the street before DOC installed the device, but while Mr. Belleau waited for a bus outside the jail, DOC agents escorted him back in to the jail to install the device. (*Id.*) The device is known as an ExacuTrack One, provided to defendants by BI Incorporated, the vendor with which the defendants contract for the tracking hardware and software used to implement Wis. Stat. § 301.48. (PFOF ¶ 16.) Mr. Belleau did not consent to the attachment of the ExacuTrack One. (PFOF ¶ 17.) One DOC agent placed the device on his ankle and tightened it at the instruction of the other agent, despite Mr. Belleau's objection, causing a blister on his leg. (*Id.*)

At no time did Defendants or the State of Wisconsin obtain a warrant or other court order based upon probable cause for Mr. Belleau's detention at the jail, for placement of the GPS monitoring device on his person, for his periodic detention in his own home for charging or

maintenance, or for continuous monitoring of his location through the GPS device. (Stip. ¶ 34, PFOF ¶ 18.)

Pursuant to Wis. Stat. § 301.48, Mr. Belleau will be required to wear a GPS monitor 24 hours per day for the remainder of his life. (Stip. ¶ 33.)  Emphasizing the permanence of GPS monitoring for Mr. Belleau, defendants' monitoring records demonstrate that people have been hospitalized and sent to nursing homes still wearing GPS, and some have died while on GPS monitoring since 2010. (Stip. ¶ 16.) The GPS requirement is in addition to the registration and reporting obligations DOC imposes on Mr. Belleau through its sex offender registration and notification laws. (PFOF ¶ 30.)

The GPS device is a cylinder approximately 2 ½ x 3 ½ by 1 ½ inches that is attached to Mr. Belleau's right leg by a black strap that is wrapped around his ankle. (Stip. ¶ 35.) Although the device can be worn under the pants leg, it is sometimes directly visible to members of the public and it can cause a visible bulge of the pants leg at the ankle. (PFOF ¶ 20.) Mr. Belleau does not wear shorts in public; the device will be plainly visible if he does. Several residents have indicated to Mr. Belleau that they have noticed the monitor and know that he is a sex offender. At least one of these persons has told him to stay away, brandishing a gun to emphasize the warning, and others no longer speak to him. (*Id.*)  Registrants have complained with some regularity to the GPS specialist about public embarrassment from wearing the device. (*Id.*) In another case, Mr. Belleau had been kneeling at his church to receive communion, and a fellow parishioner who had noticed the unit while he was kneeling inquired about it. (*Id.*) The GPS unit also emits audible messages when the batteries are low or when a GPS specialist or Monitoring Center operator initiates a message to the offender. (PFOF ¶ 20.)  The messages include "call your officer now," "low battery, recharge unit," "report to the office immediately" and

"remember your appointment." (Stip. ¶ 25.) These messages, if received in public, could also identify the person wearing the GPS unit as a sex offender. Mr. Belleau has received such messages. (PFOF ¶ 21-22.)

DOC prohibits Mr. Belleau from tampering with or removing the GPS device. (PFOF ¶ 23.) Inserting an object between the strap and ankle can cause an alert to the DOC's Monitoring Center that the device has been tampered with. (PFOF ¶ 24.) When the monitoring center receives such a "tamper alert," it notifies the GPS Specialist, who then may contact local law enforcement to check on the offender, or the Specialist or the Center contacts law enforcement directly. (Stip. ¶ 13.) Mr. Belleau has received visits from local police because of these tamper alerts, even when he has not tampered with the device. (PFOF ¶ 25.)

The GPS device rubs against and causes discomfort and occasional blistering on the skin and interferes with certain activities of daily living, such as dressing. (PFOF ¶ 26.) The GPS device's batteries must be charged for approximately one hour in each 24-hour period; in order to charge the batteries, Mr. Belleau must plug a charging cord into the device and the cord into an electrical outlet. (Stip. ¶ 36.) The device remains on Mr. Belleau's ankle during charging, so he cannot move more than several feet from the outlet. (PFOF ¶ 27.) The charging process thus severely restricts Mr. Belleau's movements for at least an hour each day. (PFOF ¶ 28.) Mr. Belleau only charges his device's battery at home, because to charge it in public would draw attention to and identify him as a criminal and sex offender. (*Id.*)

The GPS device's batteries have malfunctioned on occasion, requiring DOC-hired technicians to come to Mr. Belleau's home to replace or repair the batteries. (Stip. ¶ 37.) Mr. Belleau must remain at his home to await their arrival and submit to their attachment of a new or repaired device. The repairs have taken up to an hour to complete. (PFOF ¶ 29.) The GPS

Specialist's records reflect several instances in which service was required at Mr. Belleau's home. (*Id*.) In addition, Sex Offender Specialists from the DOC Sex Offender Registration Program make home visits. Local police and United States Marshalls in marked squad cars have accompanied DOC staff on these visits to Mr. Belleau's home, stationed themselves outside his door, calling the neighborhood's attention to Mr. Belleau's home. (PFOF ¶ 31.) The GPS specialist may also notify the SORP staff of information derived from GPS tracking, which can result in further contacts between people like Mr. Belleau and DOC staff and/or local law enforcement. (PFOF ¶ 32.) SORP staff may also request information to locate registrants, either retrospectively or in real time. (PFOF ¶ 33.) For instance, police, acting at the behest of SORP staff who believed Mr. Belleau was in violation of registration requirements because he was homeless, located Mr. Belleau at a motel with help of GPS monitoring center staff the day after he was released from custody in July 2010. (*Id*.)

Persons on lifetime GPS tracking who are not also subject to formal probation or parole, such as Mr. Belleau, are referred to by DOC as "maximum discharge" ("MD") offenders or registrants. (Stip. ¶ 1.) For such MD registrants, DOC generally creates no inclusion zones, but may create *exclusion* zones at the request of a victim or at the discretion of the GPS specialist if such zones are deemed necessary to protect public safety, with the approval of the Sex Offender Programs Director. (Stip. ¶ 7-11.) Nine maximum discharge offenders currently have exclusion zones, which are areas they may not enter, except to pass through. (Stip. ¶ 10-11.) Defendants have currently created a "home" zone surrounding Mr. Belleau's residence, even though DOC does not generally prohibit him from leaving his home, except for the daily time required to charge his unit and those times when he is instructed to await the arrival of a GPS technician or other DOC agent. (Stip. ¶ 21 & Ex. A thereto.)

For the sex offenders on GPS who are also subject to the supervision of probation and parole agents, the defendants' Monitoring Center staff generally only check an offender's location when they receive an "alert" that the offender has left an inclusion zone, entered an exclusion zone or there is a problem with the tracking unit. (Stip. ¶ 2, 24.) For the nearly 200 MD offenders, such as Mr. Belleau, however, Monitoring Center staff not only respond to alerts, but also review every night each such offender's locations during the preceding 24 hours. (Stip. ¶ 2, 3, 24.) In order to perform this review, a Monitoring Center operator retrieves an "Aerial Mapping Summary" for the individual MD registrant. This Summary superimposes all of the minute-by-minute location points sent by the registrant's GPS tracking unit to the monitoring center during the previous day onto a Bing satellite map. (Stip. ¶ 4-6 & Ex. B.) The operator can trace the registrant's itinerary for the entire day by viewing this map or zoom in for a closer view of points where the registrant was located at a particular time (Stip. ¶ 20 & Ex. B & C) – even to individual points within Mr. Belleau's residence. (Stip. Ex. D.) The Bing map labels certain landmarks, including schools, churches, parks and other buildings. By clicking on an individual point, the operator can determine the time of day the offender was there, the offenders exact latitude and longitude, the speed the registrant was moving, and the street address nearest to the selected points. (Stip. ¶ 20, 22 & Ex. B.) For certain areas, Bing also has a "Streetside" ground-level function, similar to Google Maps' "street view." (Stip. ¶ 20.) When these features are insufficient to identify a location, the Monitoring Center staff can enter the nearest address provided by Bing into Google or another search engine. (*Id*.)

In their daily reviews, the Monitoring Center Operators look for both technical problems with data from the GPS device (lack of data points, lost signals from the device, etc.) and for times when a registrant may be in locations they deem suspicious, even if the locations are not

part of a registrant's exclusion zone. (Stip. ¶ 16.)  They note any concerns about tracker data and a registrant's locations on a spreadsheet that is sent to the GPS specialist when it is completed. (Stip. ¶ 15, 18.)  Operators have made entries in the daily spreadsheets in the following circumstances: when the tracker sends an alert; when a registrant goes in or near a park, a playground, a school, a daycare, a hospital or clinic, a public library, a sports venue (including Miller Park, the Bradley Center and Lambeau Field), a movie theater, a golf course, a department store, a pharmacy, a bar or restaurant, a church or a shopping mall; when a registrant leaves the state or municipality; or when a registrant does not spend any time or does not spend the night in the registrant's designated "home zone." (Stip. ¶ 16.) Monitoring Center operators have made entries in these spreadsheets when Mr. Belleau "stayed home all day," when he was on a street with a school or a church, when he was across the street from an elementary school, when he was in a city park, when he was in a "wooded area," when he was at a public library, when he was at a storage facility, when he did not have location points in his home zone for the period, and when he was near a health center. (Stip. ¶ 17.)  Because he currently has no exclusion zones, Mr. Belleau is not prohibited from going to any of these areas. (Stip. ¶ 7.)

Mr. Belleau visits or has visited his church, his doctor, the homes of family members and friends (including a very close friend in a nursing home), American Legion meetings in Oconto, the public library, and his lawyers in this case. (PFOF ¶ 35.) He knows, however, that the DOC can ascertain his location at any time, currently or in the past since he was put on GPS. (*Id.*) Before being placed on GPS monitoring, he had an expectation that the government would not track his every movement, including to these places he considers private and none of the government's business. (PFOF ¶ 43.) Knowing that the government can tell he has visited such

private places is disturbing to Mr. Belleau and sometimes deters him from going to such places. (PFOF ¶ 36.)

The location data is permanently stored by the vendor and is accessible to Monitoring Center staff at any time to produce interactive maps for an offender's location on any particular day or time in the past. (Stip. ¶ 19.) In addition to the daily retrospective inspection of Mr. Belleau's location, the GPS specialist and Monitoring Center operators are able, at any time, to determine where Mr. Belleau is located. (Stip. ¶ 14, PFOF ¶ 37.) Real-time monitoring and reviews of locations further in the past would generally occur in response to requests from law enforcement investigating a crime. (Stip. ¶ 19, PFOF ¶ 38.) Law enforcement officers periodically request GPS location data specific to the time and place of a criminal offense to determine if there is a possible connection between the offense and a person subject to GPS tracking. (Stip. ¶ 19.)

In general, sex offenders subject to lifetime GPS monitoring may petition pursuant to Wis. Stat. § 301.48(6) to terminate lifetime GPS tracking after a period of time without committing an offense. However, a person, such as Mr. Belleau, who is subject to lifetime tracking under Wis. Stat. § 301.48(2)(b), may not file a petition requesting termination, because he was released from Ch. 980 commitment. (Stip. ¶ 38 & Wis. Stat. § 301.48(6)(b)3. Offenders released directly from prison after completing criminal sentences for the same conduct as Mr. Belleau, rather than being released pursuant to Ch. 980, would be eligible to petition for termination of tracking upon a showing that such tracking is no longer necessary to protect public safety. (Stip. ¶ 38 & Wis. Stat. § 301.48(6)(a).)

Wis. Stat. § 301.48(4) authorizes the DOC to assess and collect all or part of the cost of GPS tracking from the person subject to such tracking. Wis. Adm. Code § DOC 332.20 requires

persons subject to GPS tracking to pay a fee toward the cost of tracking. The amount of the fee is supposed to vary based on gross monthly income. (Stip. ¶ 39.) Despite the fact that Mr. Belleau's income was limited to a Social Security check, he was notified in September 2011 that he would have to pay $240 per month. (PFOF ¶ 41.) Based on Mr. Belleau's low income, his tracking fee has subsequently been determined to be $50 per month. (Stip. ¶ 39.) If a person, such as Mr. Belleau, who is subject to GPS monitoring but is not also on probation, parole or extended supervision fails to pay the fee, the DOC may seek to collect the fee, without an administrative or judicial hearing, through wage assignment, a contracted collection agency, intercepting any Wisconsin tax refund or lottery winnings or "any other appropriate means." (PFOF ¶ 42; Wis. Adm. Code, § DOC 332.20(5).)

## ARGUMENT

### I. Lifetime Imposition of GPS Monitoring Violates the Ex Post Facto Clause.

Article 1, Section 10 of the United States Constitution prohibits the states from passing ex post facto laws. Alexander Hamilton, in Federalist No. 78, identified the ex post fact prohibition as a "specified exception[] to the legislative authority," Federalist Papers 394 (Garry Wills, Ed., Bantam Books 1982), and recognized the unique role of the federal courts in enforcing it: "Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the constitution void." *Id.* The Ex Post Facto Clause prohibits the States from imposing a different and greater punishment upon a person for a criminal act than was associated with the act at the time the person committed it.[1] *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (listing

---

[1] As this Court noted in denying defendants' earlier motion to dismiss, Mr. Belleau is only subject to lifetime GPS monitoring because he was discharged from commitment under Wis. Stat. Ch. 980, and he was only subject to commitment under Ch. 980 because he had committed "sexually violent" offenses in the late 1980s, more than fifteen years before Wisconsin created the GPS monitoring requirement in

four categories of laws "within the words and intent of the prohibition" on ex post facto laws, including "3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.").

The Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84 (2003), provides the framework for determining whether a state regulation of persons who committed sex offenses before the regulation was enacted is "punitive," and thus violates the Ex Post Facto Clause. *Smith* upheld against ex post facto challenge Alaska's Sex Offender Registration and Notification Act, concluding that collection and publication of accurate and publicly available information about sex offenders to allow private citizens to take steps to protect themselves was not "punitive." However, it was implicit in the Court's decision that sex offender regulations could eventually cross the line between a civil safety regulation and a punitive infringement of the Ex Post Facto Clause. Wisconsin's lifetime GPS requirement has crossed that line.

*Smith* applied a two-part "intent-effects" test. If a statute is intended by the legislature to be punitive, the inquiry ends and the law may not be applied retroactively. If "the intention was to enact a regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil'." *Id.* at 92 (internal quotations and citations omitted).

As discussed below, there is substantial evidence the legislature intended GPS tracking to punish those subject to it, but even in the absence of a finding of a punitive legislative intent, the law's effects render it punitive. The effects of the lifetime GPS monitoring requirement on people like Mr. Belleau must be understood against the backdrop of Wisconsin's already extensive and burdensome regime for monitoring and regulating sex offenders after their

---

2005 Act 431. *Belleau v. Greene*, No. 12-CV-1198, 2013 WL 1975672, *2 (E.D. Wis. May 13, 2013). Because the law thus applies retroactively to Mr. Belleau, the principal question in this case is whether the lifetime GPS monitoring imposes a punishment.

criminal sentences are ostensibly complete. *Smith*, 538 U.S. at 99-100 (a court must "inquire how the effects of the law are felt by those subject to it.") That regime includes registration (which requires the registrant to provide the state with address, employment, internet identifier and other information); publication of extensive information about registrants on the internet; requirements that registrants give notice before moving or taking a job, update personal information on a regular basis and respond within ten days to DOC inquiries; and direct prohibitions on working with children, filming or photographing children without written parental consent or using pseudonyms. *See Mueller v. Raemisch*, 740 F.3d 1128, 1130-1131 (7th Cir. 2014). In addition to the restrictions imposed by the state, many municipalities have imposed restrictions on where offenders may live, sometimes effectively banishing them from a community. *See, e.g.*, City of Green Bay Ord. § 27.620; City of De Pere Ord. § 8-18.3; City of Milwaukee Ord. § 106-51.

While the less onerous registration and notification laws enacted in the 1990s were generally upheld against *ex post facto* challenge, courts around the country have begun recognizing the punitive nature of the increasingly extensive and intrusive new generation of sex offender restrictions, striking them down under state or federal prohibitions on *ex post facto* laws or other constitutional provisions.[2] *See, e.g.*, *State v. Letalien*, 2009 ME 130, 985 A.2d 4 (applying federal and state ex post facto prohibitions); *Doe v. Dep't of Public Safety &*

---

[2] Courts may also be reacting in part to increasing evidence that one of the rationales for strict sex offender laws – that such offenders have higher recidivism rates than other offenders – is empirically false. "[T]he most current research indicates that sex offenders, as a group, reoffend less than other criminal offenders as confirmed by federal, state, and academic studies." Tennen, "Risky Policies: How Effective Are Restrictions on Sex Offenders in Reducing Reoffending?" 58 Boston Bar J. 25, 27 (Fall 2014); *see also* Carpenter, *Legislative Epidemics: A Cautionary Tale of Criminal Laws that Have Swept the Country*, 58 Buff. L. Rev. 1, 57-58 (2010) (criticizing judicial deference to assertions of higher recidivism rates, where research shows sex offenders are less likely to reoffend than other offenders); *cf. Frank v. Walker*, 773 F.3d 783, 795 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc) (criticizing judicial "accept[ance of] findings of legislatures" in face of contrary empirical evidence for "conjur[ing] up a fact-free cocoon in which to lodge the federal judiciary. . . . [If a problem does not exist], how can the fact that a legislature says it's a problem turn it into one? If the Wisconsin legislature says witches are a problem, shall Wisconsin courts be permitted to conduct witch trials?").

*Correctional Servs.*, 430 Md. 535, 62 A.3d 123 (2013) (plurality opinion) (state ex post facto clause), 62 A.3d at 577-578 (concurring opinion) ("[T]he cumulative effect of 2009 and 2010 amendments of the State's sex offender registration law took that law across the line from civil regulation to an element of the punishment of offenders. . . . [I]n light of both Article 17 of the Declaration of Rights and Article I, § 10 of the federal Constitution, like other new laws affecting punishment for offenses, those amendments may not be applied retroactively.") ; *Starkey v. Okla. Dep't of Corrections*, 2013 OK 43, 305 P.3d 1004 (state ex post facto clause); *Wallace v. State*, 905 N.E.2d 371 (Ind. S.Ct. 2009) (state ex post facto clause); *State v. Williams*, 952 N.E.2d 1108 (Ohio S.Ct. 2011) (Ohio constitutional ban on retroactive punishment); *Doe v. Prosecutor, Marion County*, 705 F.3d 694 (7th Cir. 2013) (First Amendment); *Schepers v. Comm'r, Indiana Dep't of Corrections*, 691 F.3d 909 (7th Cir. 2012) (procedural due process).

These courts' conclusions that sex offender regulations have gone too far are consistent with the U.S. Supreme Court's admonitions that the question of whether a law is punitive is "a matter of degree." *California Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995) ("[W]e have long held that the question of what legislative adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition' *must* be a matter of 'degree.'") (emphasis in original) (quoting *Beazell v. Ohio*, 269 U.S. 167, 171 (1925)).

Heaped upon Wisconsin's already burdensome sex offender regulations, continuous lifetime GPS tracking is the final indignity, stripping those subject to it of basic privacy, limiting their movement for significant periods of time each day, and exposing them to a high likelihood of public humiliation, harassment and even physical assault. Recognizing that GPS monitoring imposes unique burdens on fundamental liberties, the highest courts in Massachusetts and New Jersey have struck down GPS monitoring of sex offenders as violations of the *ex post facto*

prohibitions in the federal and state constitutions. *Commonwealth v. Cory*, 454 Mass. 559, 911 N.E.2d 187 (2009); *Riley v. New Jersey State Parole Bd.*, 98 A.3d 544 (N.J. Sup. Ct. 2014).[3] And the Supreme Court of South Carolina has similarly held that lifetime GPS monitoring without an opportunity to be removed from monitoring on a showing of lack of dangerousness violates substantive due process protections, because such an intrusion without an opportunity for judicial review "is arbitrary and cannot be deemed rationally related to the legislature's stated purpose of protecting the public from those with a high risk of reoffending."[4] *State v. Dykes*, 403 S.C. 499, 744 S.E.2d 505, 508-509 (2014).

In holding that the imposition of GPS monitoring on a person who committed his crime before enactment of such monitoring constituted retroactive punishment forbidden by the *Ex Post Facto* clause, *Corey* noted that "[t]here is no context other than punishment in which the State physically attaches an item to a person, without consent and also without consideration of individual circumstances, that must remain attached for a period of years and may not be tampered with or removed on penalty of imprisonment." 911 N.E.2d at 196. And the New Jersey Supreme Court held that "the real world effects of the twenty-four-hour monitoring regime on [the plaintiff's] life are unmistakably punitive in nature," *Riley*, 98 A.3d at 557, noting that an offender "is condemned to wear the electronic monitoring device for the rest of his life," *id.* at 558, and that the device could under certain circumstances become visible and "send audible messages" that "identif[y] [the plaintiff]" as a sex offender no less clearly than if he wore a scarlet letter." *Id.* at 559. In short, as aptly described in an article once touted on the website of BI Inc.,

---

[3] In *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), the court rejected an ex post facto challenge to the imposition of GPS monitoring for an offense committed prior to the effective date of the GPS law. However, as noted in *Riley*, 98 A.3d at 556, the GPS requirement was imposed as "an additional condition of an ongoing probation . . . while the offender [was] still serving his sentence." Here, in contrast, the GPS requirement was imposed long after Mr. Belleau completed his criminal sentence.

[4] As discussed below, the lack of a rational relationship between a restriction and its asserted non-punitive purpose is a relevant factor in determining whether the restriction will be deemed punitive.

Wisconsin's GPS vendor, electronic monitoring constitutes a "prison without walls." (PFOF ¶ 19.) An electronic prison is no less punitive because it uses technology in place of bricks and mortar and prison guards.

### A. The Legislature Intended GPS Monitoring to Be Punitive.

In determining whether a legislature intends a law to be regulatory or punitive, courts should consider the legislature's expressed intent, as well as "other formal attributes of [the] legislative enactment, such as the manner of its codification or its enforcement procedures," which may be "probative of legislative intent." 538 U.S. at 93-94. Although a court should "ordinarily defer to the legislature's stated intent," *id.* at 92, "it would be naïve to look no further, given the pervasive attitudes toward sex offenders." *Id.* at 108-109 (Souter, J., concurring). "[W]hen a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones." *Id.* at 109.

The Act that created lifetime GPS tracking of certain sex offenders, 2005 Wis. Act 431, does not contain an express statement of legislative intent or purpose. However, the plain language of the law evinces a criminal justice purpose – the detection of crime and apprehension of offenders. "Global positioning system tracking" is defined as "tracking using a system that . . . timely reports or records the person's presence *near or at a crime scene*." Wis. Stat. § 301.48(1)(b). DOC staff review the location of a maximum discharge offender, such as Belleau, at a particular time in response to a law enforcement request as part of the investigation of a past criminal offense. (Stip ¶ 19, PFOF ¶ 38.) Mr. Belleau himself was located shortly after his release by police who were looking for him because he was believed to be in violation of

registration requirements because he was homeless (the sanction for homelessness was later rescinded). (PFOF ¶ 33.)

Legislators were aware that the GPS requirement could be viewed as punishment. An Oct. 12, 2005 email to Legislative Reference Bureau staff from an aide to Rep. Scott Suder, a lead sponsor of the bill that became 2005 Wis. Act 431, instructs that the bill be amended to "[m]ake sure that GPS is ordered at the time of criminal sentencing rather than the civil sentencing, to eliminate the constitutionality concerns." (PFOF ¶ 3.) On November 7, 2005, a legislative attorney in the LRB warned legislative staffers that "the GPS requirements contained in this substitute amendment may be unconstitutional. Arguably, they increase the penalty for offenders who have already been sentenced, in violation of the constitutional prohibition on ex post facto laws." (*Id.*) The sponsor responded to these concerns by stating: "As far as the constitutionality of lifetime for offenders who are already in prison, we have already discussed this scenario and would like to move forward with the bill as it is written." (*Id.*) When a legislator knows that a proposed law could be deemed punitive, but enacts it despite that knowledge, a court can appropriately infer that the legislator intends the law to be punitive or is at least deliberately indifferent to its punitive effect. *Cf. Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996) (to establish equal protection violation, plaintiff "must show that the defendants acted either intentionally or with deliberate indifference").

Moreover, the legislative history of the bill indicates that GPS tracking was intended to be part of the offender's criminal sentence and to serve investigatory and other criminal justice functions, rather than to prevent future crimes. The initial version of the bill that ultimately became Act 431 would have imposed GPS tracking only by DOC on individuals on probation, parole or extended supervision, and by the Department of Health Services ("DHS") on sexually

violent persons on supervised release under Ch. 980, and the duration of tracking would have been limited to the time of such supervision. (PFOF ¶ 4.) Rep. Suder stated he "would like this bill to apply to all sex offenders regardless of where they are in the process. i.e., those already on parole, probation, or extended supervision and those beginning those processes," but initially did not request that the tracking last for the offender's lifetime. (*Id.*) The fact that the durations of GPS monitoring and criminal supervision were coterminous indicates that the sponsor of the law considered GPS tracking to be a part of parolees' and probationers' criminal sentences.

The legislative history further demonstrates that there are no limits to the intrusions the legislature would impose on sex offenders, including intrusions below the surface of a person's skin. The definition of "GPS tracking" was amended to include a provision allowing DOC to use "comparable technology" for tracking in the future. Wis. Stat. § 301.48(1)(b). A Legislative Reference Bureau note of a conversation with "Luke" (presumably Luke Hilgemann in Rep. Suder's office) about changes requested by "Suder & Kleefish" reveals that the "or comparable technology" language was inserted "to allow for implantation." (PFOF ¶ 5.) Such a "compelled physical intrusion beneath [a person's] skin" constitutes an "invasion of bodily integrity implicat[ing] an individual's 'most personal and deep-rooted expectations of privacy.'" *Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013).

The GPS monitoring provisions were ultimately codified in Chapter 301, the "Corrections" section of the Wisconsin Statutes, and assign tracking and monitoring responsibility to the DOC. The DOC' principal purposes involve "the custody and discipline of all prisoners" and supervision of "parole, extended supervision and probation." Wis. Stat. § 301.03(2) & (3). Its stated "goal is the safe custody and supervision of offenders using the best, most effective correctional policies and procedures." (See http://doc.wi.gov/Home). In other

words, the DOC executes criminal sentences imposed on those convicted of crimes in Wisconsin's courts.[5] As originally proposed, DHS would have been responsible for the monitoring of people who were subject to Ch. 980 detention or supervised release, but the final legislation assigned responsibility for monitoring *all* sex offenders on GPS to the DOC. This was a conscious choice, as reflected in an email from an aide to Rep. Suder to LRB, which states, "We would like DOC to have responsibility for monitoring them [people on 'conditional release' under Ch. 980] from the start." (PFOF ¶ 6.) The codification of the GPS tracking law in the "correction" chapters of the statutes and use of corrections staff to do the monitoring even of those who were no longer under a criminal sentence thus reinforces the inference that the legislature intended GPS tracking to be a part of an offender's punishment.[6]

### B.    GPS Monitoring Is Punitive in its Effects.

In making a determination whether the effects of a law render it punitive, courts apply a multi-factor test derived from *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). The most relevant factors in the context of sex offender regulation are: (1) whether the regulatory

---

[5] *See, e.g.*, Wis. Stat. § 967.02(2) (definition of "department" for criminal procedure statutes is "the department of corrections"); Wis. Stat. § 973.10(1) ("Imposition of probation shall have the effect of placing the defendant in the custody of the department and shall subject the defendant to the control of the department . . ."); Wis. Stat. § 973.01(1) (describing sentences of "imprisonment in the Wisconsin state prisons"); Wis. Stat. § 302.01(1) (defining "state prisons" as the correctional facilities under the control of the DOC under Wis. Stat. § 301.03(1) & (2)).

[6] Other provisions of 2005 Wis. Act 431 further reinforce a finding of punitive purpose. Section 6 of the Act created Wis. Stat. § 301.46(5)(bm)1., which required DOC to include on the sex offender web site "a notice, written in red letters" of an offender's status as a "sexually violent person," branding the person with a literal "scarlet letter" on the internet. The same section requires that "the name and court of the judge who authorized supervised release or discharge for" an offender be posted on the internet. It is difficult to see these provisions as anything but an attempt to shame both offenders and the judges who release them when the offenders are no longer sufficiently dangerous to involuntarily confine. Recognizing that "[c]onstruing a section with other sections of a statute helps to ascertain legislative intent," Wisconsin and federal courts apply the "whole act rule" and the in pari materia principle to look beyond a single statutory section to derive legislative purpose. *Roth v. LaFarge Sch. Dist. Bd. of Canvassers*, 2002 WI App. 309, ¶8, 259 Wis. 2d 349, 354; *see also Bogie v. Rosenberg*, 705 F.3d 603, 613 (7th Cir. 2013). Section 6's attempt at shaming reinforces the legislature's hostility to sex offenders and the retributive purpose of the legislation as a whole and allows an inference that the entire law, including the lifetime GPS tracking requirement, is punitive.

strictures impose "affirmative disabilities or restraints;" (2) whether the regulation promotes the traditional aims of punishment; (3) whether its impositions have historically been regarded as punishment; (4) whether an "alternative purpose to which it may rationally be connected is assignable for it"; and (5) whether it appears excessive in relation to the alternative purpose assigned. *Smith*, 538 U.S. at 97. The factors are "neither exhaustive nor dispositive," but are "useful guideposts." *Id.* Not all factors must tip in one direction to warrant a finding of punitive effect. *Hudson v. U.S.*, 522 U.S. 93, 101 (1997) ("No one factor should be considered controlling as they may point in opposing directions."). But here, all of the factors do tip toward a finding that lifetime GPS monitoring is punitive.

### 1. Lifetime GPS Monitoring Imposes Severe and Direct Restraints.

In considering whether a law subjects a plaintiff to an "affirmative disability or restraint," a court must "inquire how the effects of the law are felt by those subject to it." *Smith*, 538 U.S. at 99-100. The severity of a law's disabilities or restraints is a relevant factor, such that a "minor" restraint is "unlikely to be punitive." *Id.* at 100. Conversely, "if the 'affirmative disability or restraint' is direct and extreme, then the statute's effects are more likely to be punitive." *Riley*, 98 A.3d at 559. In concluding that Alaska's registration and notification law was more like a public safety measure and less like punishment, the majority in *Smith* emphasized that the law allowed ex-offenders "to move where they wish and to live and work as other citizens, *with no supervision*." *Id.*

In contrast, lifetime GPS monitoring in Wisconsin:

• imposes *constant* minute-by-minute 24-hour-per-day supervision for the remainder of the offender's life and, in Mr. Belleau's case, without any opportunity to terminate tracking even if he can show that it is no longer needed for public safety;
• requires the monitored person to wear a device on his body at all times;
• requires recharging that keeps the monitored person at home for an hour each day;

> • limits the clothing a person can wear without being branded a criminal and exposed to shunning and abuse;
> • subjects the person to frequent in-person and telephone contact from law enforcement, DOC personnel and technicians from the GPS vendor;
> • exposes the offender to receiving audible messages in public; and
> • imposes other restraints that are not imposed on free citizens.

GPS monitoring is thus more accurately characterized as punitive than Alaska's registration law, which imposed none of these intrusions or burdens. *See Riley*, 98 A.3d at 559 ("Here, the disabilities and restraints placed on Riley through twenty-four-hour GPS monitoring enabled by a tracking device fastened to his ankle could hardly be called 'minor and indirect.'"). A "requirement permanently to attach a GPS device" to one's body is "dramatically more intrusive and burdensome" than a requirement to register. *Corey*, 911 N.E.2d at 196. And the invasion of a person's reasonable expectations of privacy is a substantial burden on liberty. *Id.* (comparing GPS monitoring to "having a personal guard constantly and physically present" and concluding "continuous reporting of the offender's location to the probation department . . . represents an affirmative burden on liberty.").

In the context of determining whether the burdens imposed by Indiana's sex offender registration law triggered procedural due process protections, the Seventh Circuit noted that the law "deprives [registrants] of a variety of rights and privileges held by ordinary Indiana citizens, in a manner closely analogous to the deprivations imposed on parolees or persons on supervisory release." *Schepers v. Comm'r, Indiana Dep't of Corrections*, 691 F.3d 909, 914 (7th Cir. 2012). Similarly, the loss of privacy and other affirmative deprivations imposed by GPS tracking closely simulate the conditions of probation or extended supervision, and thus render such tracking punitive.[7] It is well settled that probation, parole and other forms of "criminal

---

[7] To be sure, GPS monitoring is not *exactly* like probation and parole, because, for instance, it does not authorize "revocation" or direct detention because of entry into an exclusion zone. But, as the Supreme Court long ago held in *Cummings v. Missouri*, it is not the *form* of the enactment that matters,

supervision" are punishment. *Samson v. California*, 547 U.S. 843, 850 (2006) (parole "on the 'continuum' of state-imposed punishments"); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).

### 2. Lifetime GPS Monitoring Is Designed To Advance Traditional Aims of Criminal Punishment.

Deterring criminal activity is among the traditional aims of punishment in the criminal justice system. *Smith*, 538 U.S. at 102. While the *Smith* Court recognized that Alaska's registration and notification law might advance the criminal law's traditional aim of deterrence, it concluded that the "mere presence" of a deterrent purpose was insufficient to render a regulatory program criminal, because "many governmental programs might deter crime without imposing punishment." *Id.*

Here, however, not only is GPS tracking designed to advance the traditional deterrent aim of criminal punishment, it uses traditional *methods* – detection and punishment of past crime – to achieve its deterrent goal. Alaska's registration and notification program achieved its deterrent effect primarily by communicating information to the public. *Smith*, 538 U.S. at 101 ("The state makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant."). This "public education" model of registration and notification laws departs from traditional criminal justice methods, which rely on detection and punishment of crime to achieve deterrence. GPS tracking, in contrast to non-punitive registration and notification, provides no additional information to the public, which has no access to DOC's mapping or location data. Rather, it

---

but its *substance*. 71 U.S. (4 Wall.) 277, 325 (1867) ("The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised."). The restraints of lifetime GPS tracking are punitive in substance, even if not in all particulars. The Seventh Circuit has recognized that even forms of "unsupervised probation," as described by the United States Sentencing Commission, are "a punishment method." *United States v. Caputo*, 978 F.2d 972, 977 (7th Cir. 1992).

expressly facilitates conventional law enforcement detection and prosecution of completed crimes. *See* Wis. Stat. § 301.48(1)(b) (GPS tracking defined as "tracking using a system that . . . timely reports or records the person's presence *near or at a crime scene*").

The legislative history of Act 431 further confirms that the legislature intended to deploy the traditional criminal justice mechanism of detection and punishment to try to fight crime. Emails from the CEO of a tracking technology company to legislative aides disclaimed the ability to *prevent* a sex crime from occurring: "It is important that the public does not perceive this as a tool that will stop a crime from occurring." (PFOF ¶ 8.) Instead, GPS tracking provides the ability "to use GPS tracking data, or other non compliance [data] like tampering [incidents] that would implicate them in a crime." (*Id.*) To the extent that the legislature intended GPS tracking as a deterrent, then, it intended it to operate in exactly the same way as any other criminal investigation technique: by making possible detection and prosecution of already completed crimes. (*Id.*)[8]

Retribution is another recognized traditional aim of punishment. *Smith*, 538 U.S. at 102. As noted in section I.A. of this brief, various aspects of the legislative history suggest an overall retributive purpose behind Act 431 and its GPS monitoring provisions.

### 3. Lifetime GPS Monitoring Resembles Traditional Forms of Punishment.

In its analysis of this factor in *Smith*, the Court considered three historical forms of punishment to which Alaska's system had been compared: "public shaming, humiliation and banishment." 538 U.S. at 97-98. Being required to wear a device that transmits audible messages

---

[8] Thus far, the empirical data do not support even this marginal deterrent effect from GPS tracking. Calkins, *et al.*, "Sexual Violence Legislation: A Review of Case Law and Empirical Research," 20 Psychol. Pub. Policy & L. 443, 456-457 (2014); Shekhter, "Every Step You Take, They'll Be Watching You: The Legal and Practical Implications of Lifetime GPS Monitoring of Sex Offenders," 38 Hastings Const. L.Q. 1085, 1088 (2011) ("[N]o studies demonstratively conclude that GPS monitoring decreases recidivism.").

and that may be visible to the public will predictably subject offenders to public labeling and humiliation and thus closely resembles historical shaming punishments.

The *Smith* Court emphasized that historical shaming punishments involved public "labeling" that imposed "permanent stigmas." *Id.* The Court distinguished Alaska's registration and notification law by noting that it did not entail the "face-to face" identification of an offender, but rather simple "dissemination of accurate information" by means that did not involve a "direct confrontation between the offender and the public." *Id.* at 98. In contrast, observing a GPS device worn by an offender or hearing a message – such as "call your officer now" or "low battery, recharge unit" – necessarily entails the observer's or auditor's presence with the offender. As the New Jersey Supreme Court noted in *Riley*:

> Even though [the GPS monitoring law]'s purpose is not to shame Riley, the "effects" of the scheme will have that result. If Riley were to wear shorts in a mall or a bathing suit on the beach, or change clothes in a public locker or dressing room, or pass through an airport, the presence of the device would become apparent to members of the public. The tracking device attached to Riley's ankle identifies Riley as a sex offender no less clearly than if he wore a scarlet letter. His parole officer may also send audible messages to Riley on the tracker that he may receive in a public place.

98 A.3d at 559.[9]

Moreover, the "information" imparted when a member of the public hears or sees the unit cannot be characterized as "accurate." It does not tell the recipient the crimes the offender committed or when those crimes were committed, as the sex offender website does. Rather, it conveys an ambiguous message that the wearer is a dangerous or despicable person who committed a crime that justifies constant surveillance. Indeed, the ambiguity of the message makes the offender all the more frightening or revolting to a person who observes his electronic ball and chain.

---

[9] *See also Corey*, 911 N.E.2d at 196 n.18 ("To the extent that the ankle bracelet portion of the GPS device is potentially visible to the public, it may have the additional punitive effect of exposing the offender to persecution or ostracism . . . .").

The potential for face-to-face shaming, and even for vigilante attacks, is not merely theoretical. In one study, 37% of respondents said they believed sex offenders had no rights, 44% said it was acceptable to harass sex offenders, 35% said they thought it was acceptable to injure such offenders, and 28% said it was acceptable to damage offenders' property. Wagner, Note, *The Good Left Undone: How to Stop Sex Offender Laws from Causing Unnecessary Harm at the Expense of Effectiveness*, 38 Am. J. Crim. L. 263, 267 (2011) (citing Schiavone & Jeglic, *Public Perceptions of Sex offender Social Policies & the Impact on Sex Offenders*, 53 Int'l J. Offender Therapy & Comp. Criminology 679, 687-88 (2009)). Sex offenders report that harassment is common; some have been beaten and a few even murdered. *Id.* at 272-273. Mr. Belleau has had a gun brandished by a person who discovered his status. (PFOF ¶ 20.)

A person subject to GPS monitoring is also identified to neighbors as a criminal by frequent visits from police and technicians responding to tamper alerts or equipment malfunctions or checking on concerns identified by Monitoring Center staff in their nightly reviews of the person's location, even if the person has committed no infraction and violated no law. Mr. Belleau has had many such visits and has had neighbors shun him when they became aware of his status as an offender. (PFOF ¶ 20, 29, 31.)

As noted earlier, GPS tracking also closely resembles probation and supervised release, both conventional forms of punishment. *Samson*, 547 U.S. at 850; *Griffin*, 483 U.S. at 874.[10] The New Jersey Supreme Court in *Riley* noted that, while there "are not direct historical analogues to a twenty-four-hour-a-day electronic surveillance that can track an individual's every movement," the "closest analogue . . . is parole and, more particularly, parole supervision for life." 98 A.3d at 558. The court said New Jersey's GPS law "looks like parole, monitors like parole, restricts

---

[10] *Smith* addressed the analogy between Alaska's registration and notification requirement and probation – an analogy it described as having "some force" – in its discussion of the law's "affirmative disabilities and restraints." 538 U.S. at 101.

like parole, serves the general purposes of parole, and is run by the Parole Board. Calling this scheme by another name does not alter its essential nature." *Id.* The same is true in Wisconsin, where the DOC's Division of Community Corrections monitors both mandatory discharge registrants like Mr. Belleau and probationers and parolees.

### 4. Lifetime GPS Monitoring Is Not Rationally Related to and Is Excessive In Relation to Its Asserted Non-punitive Purpose.

Although listed as separate factors in *Smith*, the inquiries into whether a challenged law "has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose," 538 U.S. at 97, are interrelated. The first factor emphasizes "whether an alternative purpose to which [the challenged law] may rationally be connected is assignable for it." *Mendoza-Martinez*, 372 U.S. at 168-169. That is, whether a plausible non-punitive purpose for the law can be asserted. The second factor emphasizes the "fit" of the law to its non-punitive objectives and weighs the costs of the law to those subject to it against its benefits to the public.

Courts applying these factors ask whether the law's restrictions have a "rational" relationship to the assigned purpose, applying a deferential, but not entirely toothless level of scrutiny. *See Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (in equal protection case, "rational-basis standard is 'not a toothless one'"). The Court in *Smith* rejected the argument that a law must be "narrowly drawn to accomplish the stated purpose," suggesting that mere "imprecision" in the law's approach to achieving its purpose would not tip this factor in favor of the challenger. *Smith*, 538 U.S. at 103. However, "[a] necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational." *Doe v. Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 112 n.9 (3d Cir. 2008) (equal protection challenge to disparate treatment of out-of-state sex offenders).

Indeed, the Court in *Smith* endorsed a sliding scale approach to these factors, where "the magnitude of the restraint" affects how narrowly tailored a law must be to its purpose to survive ex post facto review. 538 U.S. at 104. The court distinguished the civil commitment statute at issue in *Kansas v. Hendricks*, 521 U.S. 346 (1997),[11] where the Court had required strong procedural protections to ensure that only "particularly dangerous individuals" were subject to the onerous restraint of potentially indefinite confinement, from Alaska's "more minor condition of registration" and publication of "accurate, nonprivate information about the registrant's convictions," which allowed the legislature to "dispense with individual predictions of future dangerousness." *Smith*, 538 U.S. at 104.

Certainly, protecting the public from sex crimes is a legitimate governmental purpose, and the use of GPS monitoring could plausibly enhance public safety to some degree,[12] but the severity of the intrusions and restrictions entailed in continuous lifetime tracking is excessive in relation to the marginal public safety benefit. Providing accurate information to the public about a registrant's criminal history through registration and notification processes may be a reasonable means of achieving that purpose. But Mr. Belleau is already subject to Wisconsin's extensive registration and notification requirements, and the much more intrusive – and largely redundant – step of continuous, lifetime GPS tracking, without any opportunity to be relieved from that intrusion, so far exceeds any purported public safety benefit as to render the monitoring regime irrational and excessive.

---

[11] *Hendricks* held, "Where the State has 'disavowed any punitive intent'; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; . . . and permitted immediate release upon a showing that the individual is no longer dangerous . . . involuntary confinement pursuant to the Act is not punitive." 521 U.S. at 368-69.

[12] Indeed, subjecting *all* people to GPS location tracking would undoubtedly reduce crime and enhance public safety, because anyone's whereabouts could be ascertained easily by police conducting criminal investigations, making detection and punishment of any crime more likely. But nobody suggests that the government could subject *everyone* to the intrusions of GPS monitoring to obtain this public safety benefit. Such an intrusive scheme would surely violate the Fourth Amendment.

Lifetime GPS tracking applies permanently to persons, such as Mr. Belleau, for whom it is increasingly unnecessary as they age and remain in the community without committing further offenses. In the context of supervised release, the Seventh Circuit has noted that a "condition of release can become onerous because of its duration as well as its content," and directed the district court to consider the "interaction between the length and the terms of the supervised release. The more onerous the terms, the shorter the period should be." *United States v. Quinn*, 698 F.3d 651, 652 (7th Cir. 2012).

Mr. Belleau has not committed a sex offense since 1989, nearly twenty-five years ago. Several federal appeals courts have held that imposing sex offender conditions of supervised release based solely on sexual offenses committed in the distant past is not "reasonably related to protecting the public and preventing recidivism." *United States v. T.M.*, 330 F.3d 1235, 1240 (9th Cir. 2003) ("Supervised release conditions predicated upon twenty-year-old incidents, without more, do not promote the goals of protection and deterrence"); *United States v. Dougan*, 684 F.3d 1030, 1037 (10th Cir. 2012) ("seventeen-year old conviction for a sexual battery was too remote in time to be reasonably related to the imposition of special sex-offender-related conditions of supervised release"); *United States v. Carter*, 463 F.3d 526, 532 (6th Cir. 2006) (sex offenses that "occurred seventeen years before the imposition of the sex-offender-treatment condition" were "too remote in time to be reasonably related" to sex offender conditions); *United States v. Scott*, 270 F.3d 632, 636 (8th Cir. 2001) (sex offender conditions "unlikely to serve the goals of deterrence or public safety, since the behavior on which the special conditions are based, though highly reprehensible, ha[d] ceased" 15 years earlier).

Moreover, as defendants' own expert testified, Mr. Belleau is at exceptionally low risk of reoffense and his risk decreases with advancing age and time in the community without another

offense. (PFOF ¶¶ 11-13); *see United States v. Hall*, 664 F.3d 456, 464-465 (4th Cir. 2012) (crediting testimony of expert that 28 months in community without reoffense indicates low likelihood of future sexual offenses). Mr. Belleau, who is 72 years old and thus at low risk of reoffense by virtue of his age, has now also been in the community for nearly five years without a reoffense, further reducing his exceptionally low likelihood of reoffense. Indeed, the Defendants' actions in Mr. Belleau's case indicate agreement that he is an exceptionally low risk. Despite authority to impose exclusion zones on MD offenders "if necessary to protect public safety," Wis. Stat. § 301.48(3)(c), and having done so for other such offenders, Defendants have not done so for Mr. Belleau. (Stip. ¶¶ 7, 9-10.)

Yet Mr. Belleau cannot even petition to have his leg freed and be removed from monitoring, unlike offenders who committed similar offenses, but were released directly from prison or from probation, parole or extended supervision – who may at least petition for termination of monitoring. Wis. Stat. § 301.48(6). This lack of an opportunity for Mr. Belleau to be removed from lifetime tracking renders the scheme even more excessive in relation to its asserted nonpunitive purpose. The South Carolina Supreme Court held that lifetime GPS monitoring without an opportunity to demonstrate that the monitoring is no longer necessary to protect public safety violates substantive due process protections, because such an intrusion without an opportunity for judicial review "is arbitrary and cannot be deemed rationally related to the legislature's stated purpose of protecting the public from those with a high risk of reoffending." *Dykes*, 744 S.E.2d at 508-509. And the Massachusetts Supreme Judicial Court found that a lifetime GPS requirement "appears excessive . . . to the extent that it applies without exception to convicted sex offenders sentenced to a probationary term, regardless of any individualized determination of their dangerousness or risk of reoffense." *Corey*, 911 N.E.2d

197. Similarly, the Indiana Supreme Court in *Gonzalez v. State*, 980 N.E.2d 312, 319-321 (Ind. 2013), held that the retroactive extension of the duration of the defendant's registration obligations from 10 years to lifetime was excessive in relation to the public safety purpose, because the law provided "no available channel through which [the offender] may petition the trial court for review of his future dangerousness or complete rehabilitation" and be removed from the registry. *Id.* at 320.

Further, the purported public safety benefits of GPS monitoring are frequently overstated. GPS tracking does not, as some of its proponents suggest, prevent future crimes. As noted in Section I.B.2 above, legislators were aware of this while drafting the law, when they received an email from the CEO of a tracking technology company that specifically disclaimed the ability to prevent a sex crime from occurring and conceded that what GPS tracking *really* provides is the ability to detect and prosecute past crimes. (PFOF ¶¶ 8, 38.) In other words, GPS tracking is simply a *criminal* investigation technique. And, of course, any preventive capability of GPS would be even more diminished in situations like Mr. Belleau's, where there are no real-time alerts resulting from entry into an exclusion zone.[13]

## II.   Involuntary Lifetime GPS Tracking Without a Warrant or Probable Cause Constitutes an Unreasonable Search and Seizure.

*Jones*, 132 S.Ct. 945, leaves no doubt that the State's physical attachment of a GPS tracking device to Mr. Belleau's ankle on July 7, 2010, for purposes of tracking his movements, constitutes a "search" subject to the Fourth Amendment's limits. However, that perpetual attachment is just one of many intrusions that are integral to DOC's system of enforcement of

---

[13] The fact that Mr. Belleau must pay a fee or surcharge for the "privilege" of being subjected to monitoring, even if the fee is not independently punitive, contributes to a conclusion that lifetime GPS monitoring is punitive overall. These sorts of surcharges and fees are indistinguishable from those imposed under criminal sentencing statutes. *See* Wis. Stat. §§ 973.042 (Child pornography surcharge); 973.046 (DNA analysis surcharge), 973.057 (GPS tracking surcharge), 973.06 (Costs, fees, and surcharges).

Wis. Stat. § 301.48; and those many intrusions have been carried out against Belleau in violation of his right to be free of unreasonable searches and seizures.

The government's Fourth Amendment violations began when DOC had Belleau jailed for days, after the Brown County circuit court determined he was no longer a sexually violent person and therefore ordered his discharge from a Chapter 980 commitment. Then, after the jail released him, he was re-detained by DOC probation agents who fastened a GPS device to his leg. A flow of data immediately began streaming to DOC's Monitoring Center, where DOC staff recorded his every move, however private, and then reviewed his activities each day. The statutory scheme also requires that he maintain the minute-by-minute GPS data streaming without interruption, on pain of criminal prosecution. To comply with that mandate, Belleau must remain tethered to an outlet for about one hour each day so that the GPS battery can be recharged using an electric cord that runs from his leg to a wall socket. When DOC staff become curious about Belleau's movements, either they, or law enforcement agents at their urging, knock on his door to question him. When the device appears to malfunction, a DOC agent and a BI ExecuTrak employee knock on his door, enter his residence, and require that he remain in their presence while they decide whether to repair or replace the device.

Hence, the State's enforcement of § 301.48 against Mr. Belleau, now about to enter its fifth year, implicates a constellation of detentions, stops, data collections, home entries, trackings, mappings and  data review, all of which have Fourth Amendment consequences.

A.     **The Trespasses to Belleau's Person, Periodic Detentions & Home Entries and Continuous GPS Surveillance Constitute Searches and Seizures.**

A "seizure" within the meaning of the Fourth Amendment occurs "when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  A "search" occurs when either: (1) the

government *physically* intrudes on an individual's "person[], houses, papers, [or] effects," *Missouri v. McNeely*, 133 S.Ct. at 1558 ("compelled physical intrusion" on "the person"), "for the purpose of obtaining information," *Jones*, 132 S.Ct. at 949; *McNeely*, 133 S.Ct. at 1558 ("to obtain . . . evidence in a criminal investigation"); or (2) the government "violate[s] a person's 'reasonable expectations of privacy'." *Jones*, 132 S.Ct. at 950.

A number of the DOC's actions in this case constitute "seizures" and the placement of a GPS monitor for purposes of obtaining location information constitutes a "search" under both definitions. Accordingly, unless the Defendants have obtained a warrant supported by probable cause to believe Mr. Belleau has committed, is committing or is about to commit a crime or the search falls within one of the narrow exceptions to the warrant requirement, the lifetime GPS tracking of Mr. Belleau violates the Fourth Amendment. *Riley v. California*, 134 S.Ct. 2437, 2482 (2014) ("[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.") (internal quotation marks and citations omitted).

*Jail Detention.* The State's preparations to ankle-cuff Michael Belleau began in Brown County Circuit Judge Kendall Kelley's courtroom. At the close of the proceedings on July 2, 2010, the State requested that the court detain Belleau in jail, even though the court had found no continuing basis for his commitment and no basis to subject him to supervised release. "The State agrees that the respondent should be discharged from commitment under this case. Due to the timing of the Holiday weekend and the need to arrange GPS monitoring, set-up and compliance, the State asks that the Discharge be effective July, 7, 2010." (PFOF ¶ 14.) The circuit court's order of discharge obliged. *Id.* From July 2 until his release on July 7, Belleau was jailed as an accommodation to DOC.

The State effected a seizure of his person, which implicates the Fourth Amendment. "Both the standards and procedures *for arrest and detention* have been derived from the Fourth Amendment and its common-law antecedents." *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (emphasis added, citations omitted.). His jail confinement clearly fell within the Fourth Amendment's concept of a seizure, as illustrated by the Supreme Court's many jail detention cases. *See, e.g.*, *Gerstein v. Pugh,* 420 U.S. 103 (1975) (Fourth Amendment requires prompt judicial determination of probable cause as a prerequisite to an extended pretrial jail detention following a warrantless arrest); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991); *Baker v. McCollan*, 443 U.S. 137, 142-43 (1979).

*DOC's continuous attachment of the GPS device to Belleau's person. Jones* held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constituted a 'search.'" 132 S.Ct. at 949. The majority did not rely on a conclusion that government's use of a GPS tracker violated the owner's "reasonable expectation of privacy,"*id*. at 949-50, but rather focused on the Amendments express protection of a person's "effects." However, the *Jones* majority also explained that "the *Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." *Id.* at 952. Consequently, the Court concluded that either a trespass or an invasion of privacy, in combination with "an attempt to find something or to obtain information," constitutes a search under the Fourth Amendment. *Id.* at 951 n.5. In combination *Jones* and *Katz* mean that either a trespass to persons, houses, papers, or effects, or a *Katz* invasion of privacy will be a search under the Fourth Amendment, when the government seeks to find something or to obtain information. *Id.* at 950–951 & n.5, 953 n.8.

Here, DOC's continuing "installation of a GPS device" on Belleau's person, and "its use of that device to monitor [Belleau's] movements," constitutes a "search." While *Jones* focused on the Fourth Amendment's reference to "effects," it did so while noting that the Amendment's protections also extend to one's person. "The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure *in their persons*, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Id.* at 939. (Emphasis added.) *McNeely* makes explicit that a physical intrusion on "the person" for purposes of obtaining information is also a search for Fourth Amendment purposes. 133 S.Ct. at 1558.

*DOC's requirement that Belleau recharge the GPS device daily.* DOC's requirement that Belleau stop his other activities to recharge DOC's GPS device for an hour each day, which can only be done by remaining within reach of a wall socket, is at least as intrusive as the investigative "stop and frisk" detention regularly performed by police officers. Both situations involve the government's interruption of a private citizen's activities and movements *Terry v. Ohio*, 392 U.S. 1, 9 (1968) ("Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street."). Wis. Stat. § 301.48 only authorizes DOC to impose these interruptions on Belleau's activities for purposes of "actively monitor[ing] and identif[ying his] location and [keeping] timely reports or records [of his] presence near or at a crime scene." Hence, DOC's daily interruptions of his activities, much like stops and frisks, are performed to aid in the investigation of criminal offenses. *Id.* at 14.

*DOC's entries to Belleau's residence for GPS maintenance and "welfare check" purposes.* DOC's GPS system often causes its personnel and private vendor technicians to gain entry to Belleau's residence to repair or replace the device. On these occasions Belleau believes he has no choice but to let them enter. In other circumstances a DOC staff person, sometimes

accompanied by a law enforcement officer, appears at his door to survey his circumstances and to question him about their concerns. These occasions also are subject to Fourth Amendment scrutiny. *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *Payton v. New York*, 445 U.S. 573, 589-90 (1980) ("the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.")

*DOC's unlimited, lifetime surveillance and mapping.* DOC's lifetime, minute-by-minute surveillance must conform to the requirements of the Fourth Amendment because it also invades Belleau's reasonable expectations of privacy. *Katz v. United States,* 389 U.S. 347, 353 (1967) (government's wiretap monitoring of telephone conversation, even without physical trespass, "constituted a 'search and seizure' within the meaning of the Fourth Amendment.")[14]

Last term, in holding that the Fourth Amendment ordinarily requires police to obtain a warrant in order to inspect data contained in a cell phone, the Supreme Court noted the power of GPS data to create a detailed and intimate portrait of the phone owner's life. *Riley v. California*, 134 S.Ct. 2473, 2490 (2014). The Court described such "[h]istoric location information" as "qualitatively different" from the sorts of information that could be gleaned from individual

---

[14] Ordinarily, a person objecting to a search that does not entail a physical intrusion must have a subjective expectation of privacy and that expectation must be objectively reasonable. Obviously, Mr. Belleau knows that his movements are being tracked by DOC, so he does not have a *current* subjective expectation that they will not be. He did have an expectation, prior to the installation of the GPS device, that his daily movements and encounters would not be subject to continuous government surveillance. (PFOF ¶ 43.)Where, as here, "an individual's subjective expectations [have] been 'conditioned' by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of the Fourth Amendment protection was. In determining whether a 'legitimate expectation of privacy' existed in such cases, a normative inquiry would be proper." *Smith v. Maryland*, 442 U.S. 735, 741 n.5 (1979). Such a normative inquiry dispenses with the subjective element and focuses on whether people would reasonably expect their movements to be private.

documents or items that might otherwise be found on the person in a search incident to arrest. *Id.* The Court observed that such location data "can reconstruct someone's specific movements down to the minute, not only around town, but also within a particular building." *Id.* The Court then quoted with approval Justice Sotomayor's concurrence in *Jones*: "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.* (quoting *Jones*, 132 S.Ct. at 955 (Sotomayor, J., concurring).[15]

The same is true of DOC's surveillance of Mr. Belleau here. The DOC knows when Mr. Belleau goes to church, to a meeting of the American Legion, to visit a close friend in a nursing home, to see his doctor at a clinic, to read at the library, when he walks past a school or goes to a theater or shopping mall, when he takes a walk in a park or through the woods, and when he is not at home for the day. (Stip. ¶¶ 16-17; PFOF ¶ 35-36.) And the government can even peer into his movements – or lack of movement – within the sanctuary of his home. (Stip. Ex. D); *see Kyllo v. United States*, 533 U.S. 27 (2001) (thermal imaging of home from exterior constitutes a search because it reveals facts about interior not otherwise open to view); *United States v. Karo*, 468 U.S. 705, 714-717 (1984) (tracking of beeper when located in defendant's residence constitutes a search requiring a warrant).

---

[15] *Riley*'s approval of the *Jones* concurrence supports the similar analysis in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd on other grounds*, *United States v. Jones*, 132 S.Ct. 945 (2012), and Judge Wood's dissent in *United States v. Cuevas-Perez*, 640 F.3d 272, 286 (7th Cir. 2011) (dissenting opinion). As Judge Wood noted, "Prolonged GPS surveillance . . . intrudes upon an individual's reasonable expectation of privacy by revealing information about her daily trajectory and patterns that would, as a practical matter, remain private without the aid of technology. This sort of constant monitoring at a personal level gives rise to precisely the 'dragnet' effect the Supreme Court identified in *Knotts* and decried years earlier in *Berger*. . . . An officer's monitoring of a person's every movement, as revealed by a GPS tracking device, is comparable to the monitoring of phone lines to intercept a person's telephone conversations. In my view, both qualify as a search under the Fourth Amendment and both require the government to obtain a warrant before the surveillance begins." *Id.* at 294.

With GPS tracking, "the whole reveals far more than the individual movements it comprises. The difference is not one of degree, but of kind, for no single journey reveals the habits and patterns that mark the distinction between a day in the life and a way of life, nor the departure from a routine that, like the dog that did not bark in the Sherlock Holmes story, may reveal even more. . . . Repeated visits to a church, a gym, a bar, or a bookie tell a story not told by any single visit . . . . A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups – and not just one fact about a person, but all such facts." *Maynard*, 615 F.3d at 562. To obtain such an intimate portrait, the government must obtain a warrant supported by probable cause to believe the subject of the monitoring has committed, is committing or is about to commit a crime.

**B.      DOC's Warrantless Searches and Seizures, Unsupported by Probable Cause Are Unreasonable.**

DOC's enforcement of § 301.48 involves a series of intrusions, including arrest, detention, investigatory stops, physical restraints, privacy invasions, trackings and mappings, that necessarily carry Fourth Amendment implications. Where, as here "a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Riley*, 134 S.Ct. at 2482 (internal quotations and citations omitted). Most of DOC's various restraints on his liberty must be tested by the Fourth Amendment's warrant requirement and standard of probable cause to believe that Belleau has or is committing a criminal offense. Even its insistence that he temporarily and daily immobilize himself to charge the device's battery should require, at minimum, the existence of a reasonable suspicion that Belleau is criminally offending before that "stop" requirement can be enforced.

DOC admits it has never secured a warrant or made a determination of probable cause for any of the intrusions its GPS program has imposed on Mr. Belleau. (Stip. ¶ 34; PFOF ¶ 18.) When Belleau was jailed for five days case in order to facilitate the Defendants' placement of the GPS device on his person, no claim was made that he had committed or was about to commit a crime. The detention was expressly done as a matter of convenience for the DOC, not because there was any probable cause to believe Mr. Belleau had committed or was about to commit a crime. His arrest on July 2 and his jail detention were imposed as matters of convenience for State officers and DOC agents, ironically so as to not interfere with their Independence Day celebrations and weekend-off days.

Even for those intrusions that might be justified based on a lower level of suspicion (such as the periodic visits to Mr. Belleau's home to ask questions or the requirement that he charge the device's battery daily), DOC cannot claim to have "articulable facts" giving rise to a "reasonable suspicion that criminal activity is afoot." *Huff v. Reichert*, 744 F.3d 999, 1005 (7th Cir. 2014). As Defendant's expert testified, Mr. Belleau's risk of reoffense even over a ten year period is exceedingly low. (PFOF ¶ 11-12.) And even a greater actuarial "risk" would not create a "reasonable suspicion" that criminal activity was *currently* "afoot."

### D. The Searches and Seizures Cannot Be Justified Under the "Special Needs" Doctrine.

The Supreme Court has recognized exceptions to the warrant requirement when "special needs" – government interests beyond normal law enforcement goals – make the warrant and probable cause requirement impracticable. *Skinner v. Railway Labor Executive's Assn.,* 489 U.S. 602, 619–20 (1989). But this "special needs" exception can be applied only so long as a government program's "primary purpose" is not to "uncover evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. 32, 42 (2000). Indeed, "special needs"

cases constitute a "closely guarded category" of exceptions to the usual warrant and probable cause requirements of Fourth Amendment jurisprudence. *Ferguson v. City of Charleston,* 532 U.S. 67, 77 (2001) (internal quotation marks omitted). Also, special needs searches and seizures, like two other two recognized categories where the search warrant requirement is not applied (*i.e.,* automobile searches and inventory searches), may still require some showing of individualized suspicion that criminal activity is afoot in order to meet the Fourth Amendment's reasonableness standard.

Here, the reasoning behind the "special needs" doctrine does not apply. DOC has no particularized interest in monitoring Belleau, other than its legislatively-declared, generalized interest in criminal investigation and detection. The very terms of Wis. Stat. § 301.48(1)(b) lead to this conclusion. In that definition provision, the legislature empowered DOC to operate a "Global positioning system tracking" scheme as "a system that *actively monitors and identifies a person's location and timely reports or records the person's presence near or at a crime scene . . . .*" (emphasis added.) To be sure, the provision allows DOC to operate the system for another purpose, *i.e.,* to conduct the same location identification, monitoring, reporting and recording a person's presence "in an exclusion zone or the person's departure from an inclusion zone." But that purpose cannot support DO''s enforcement of § 301.48 against plaintiff Belleau because, as it has conceded, it has never imposed an exclusion or inclusion zone on his movements. (Stip. ¶ 7.)  Thus, its purpose in tracking him is solely to be able to trace his whereabouts for possible connection to a crime scene. DOC's GPS system is literally a process of "connecting the dots" between a crime and possible perpetrators. By confining DOC's permissible use of a GPS device in Belleau's circumstance to crime scene investigation purposes, DOC's enforcement of Wis. Stat. § 301.48 runs directly counter to *Ferguson*'s admonition that, to qualify for a "special

needs" exception, the primary purpose of a search cannot be to "generate evidence for law enforcement purposes." 532 U.S. at 83 (emphasis omitted). Similarly, in *Edmond* the Court found that a search did not qualify under the "special needs" doctrine where the "primary purpose of the [search] is ultimately indistinguishable from the general interest in crime control." 531 U.S. at 48.

Warrantless searches that serve a special need and are based on individualized suspicion have been upheld by the Court several times. *See, e.g., O'Connor v. Ortega,* 480 U.S. 709, 725 (1987) (warrantless search of employee workspace based on reasonable suspicion of employee misconduct). By contrast, the Court in *Edmond* noted that it had "never approved a [narcotics] checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing," and held that the program was unconstitutional, emphasizing that it had recognized "only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion." 531 U.S. at 41.

*Edmond* rejected the state's argument that the checkpoint program served a non-law-enforcement need because it was broadly aimed at society's drug problem: "If we were to rest the case at this high level of generality, there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose." 531 U.S. at 42. *Ferguson,* in which the petitioners challenged a hospital program that tested their urine for cocaine use, reiterated *Edmond'*s holding, finding that a search whose "immediate objective ... was to generate evidence for law enforcement purposes" was unconstitutional, even if its "ultimate goal" was to stop substance abuse by pregnant women. 532 U.S. at 82–83.

*Edmond* and *Ferguson* control the analysis of the search and seizure issues with regard to DOC's GPS program and Belleau's recognized privacy interests. *Ferguson* emphasized that

courts should "not simply accept the State's invocation of a 'special need'" and that "[i]nstead, . . . a 'close review' of the scheme at issue" should be conducted. The Court in *Edmond* referred to this as a "purpose inquiry." 531 U.S. at 46. In each case, the Court highlighted the fact that the government's openly-declared, programmatic purpose was the detection of criminal wrongdoing.

In *Edmond*, the City of Indianapolis acknowledged that its "checkpoint" program was "an effort to interdict unlawful drugs." 531 U.S. at 41. The Court considered the City's acknowledgment determinative on the Fourth Amendment issue. 531 U.S. at 44. While observing that there could be circumstances surrounding a law enforcement checkpoint where the primary purpose was to deal with an emergency, those were not the declared bases for that checkpoint program. *Id.* The Court also considered the city's contention that the program had "lawful secondary purposes," such as the public's safety by removing impaired drivers from the road. 531 U.S. at 46. But after engaging in its "purpose inquiry," the Court rejected that attempt because the city's program "was driven by an impermissible purpose." 531 U.S. at 47.

In *Ferguson* the written policy was designed to lead to law enforcement investigations of obstetric patients who had tested positive for illegal drugs. The City of Charleston argued, however, that the Fourth Amendment analysis should instead focus on the "ultimate purpose" of getting patients "into substance abuse treatment and off of drugs," thereby "protecting the health of both the mother and child." 532 U.S. at 81-82. In rejecting that argument, while also acknowledging that the policy may have been intended as a means to those larger goals, the Court focused on the "direct and primary purpose" of the policy. "Otherwise," the Court noted, "[b]ecause law enforcement involvement always serves some broader social purpose or objective, . . . virtually any nonconsensual suspicionless search could be immunized under the

special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate purpose." 532 U.S. at 84.

Here, Wis. Stat. § 301.48 leaves no doubt about its purpose as applied to persons like Mr. Belleau, for whom no inclusion or exclusion zones are established. The direct, primary and immediate purpose for the enforcement of its GPS program, as to Belleau, is criminal investigation – linking potential suspects to a crime scene. Where, as here, the State's professed need is to use GPS technology to connect discharged sex offenders to future or past crime scenes does not constitute the sort of "special need" "divorced from the State's general law enforcement interest," the resulting warrantless and suspicionless privacy invasions, stops, seizures and searches violate the Fourth Amendment.[16].

## III.    Lifetime GPS Monitoring Violates the Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "In evaluating [a law] under the Equal Protection Clause, 'we must first determine what burden of justification the classification created thereby must meet, by looking to the nature of the classification and the individual interests affected.'" *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (citations omitted). In general, when reviewing "social or economic legislation," classifications "will be sustained" if they are "rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. However, if a law "impinge[s] on personal rights protected by the Constitution," it is "subjected to strict scrutiny." *Id.*

---

[16] Although courts engage in balancing the societal interests against privacy interests to determine whether a special needs search is "reasonable," such balancing is inappropriate where, as here, the primary purpose is criminal investigation. *Ferguson*, 532 U.S. at 78-79.

In this case, GPS monitoring impinges on Mr. Belleau's fundamental rights to privacy, to travel and to associate, and its classifications cannot withstand strict scrutiny. Moreover, the lifetime tracking law allows most offenders who are subject to it to petition for termination of tracking upon a showing that they are no longer dangerous, but prohibits persons who, like Mr. Belleau, were discharged from Ch. 980 confinement, from petitioning for termination. This differential treatment does not withstand even rational basis review.

The GPS law classifies people and treats them differently based on the categories into which they fall. There are two principal classifications of interest in this case. The first classification discriminates between: (a) those sex offenders, including Mr. Belleau, who are listed in Wis. Stat. § 301.48(2) and thus subject to the lifetime GPS tracking requirement; and (b) all other offenders, whether their crimes were sex crimes or not, who are *not* subject to lifetime GPS tracking. This classification cannot withstand strict equal protection scrutiny. The second classification discriminates between: (a) lifetime GPS sex offenders listed in Wis. Stat. § 301.48(2) who can petition for termination of lifetime tracking under Wis. Stat. § 301.48(6); and (b) the subset of those offenders, including Mr. Belleau, who cannot petition for termination because they were subject to civil commitment under Ch. 980, even though they have been determined no longer dangerous enough to be committed. In general, sex offenders subject to lifetime GPS monitoring (*i.e.*, those in category (a)) may, after being subject to tracking for a period of time without a criminal conviction, petition a court for termination of monitoring. Wis. Stat. §§ 301.48(6)(a) & 301.48(6)(b)1 & 2. If the court, after considering a physician's or psychologist's examination and report on whether the person is a danger to the public and any report from DOC on the need for continued monitoring and holding a hearing, determines that lifetime tracking is no longer necessary to protect the public, it may grant the petition terminating

tracking. Wis. Stat. §§ 301.48(6)(d) – (h). Wis. Stat. § 301.48(6)(b)3, however, prohibits persons, such as Mr. Belleau, who are placed on GPS monitoring as a result of discharge from confinement under Ch. 980, from petitioning for termination of monitoring. This is the sort of "line drawn by the legislature between offenders who are sensibly considered eligible to seek discretionary relief from the courts and those who are not" that "is, like all legislative choices affecting individual rights, open to challenge under the Equal Protection Clause." *Connecticut Dep't of Public Serv. v. Doe*, 538 U.S. 1, 10 (2003) (Souter J, concurring).[17] This second classification cannot withstand even rational basis review. There is no rational basis for depriving some "serious child sex offenders" who do not qualify as "sexually violent persons," such as Mr. Belleau, of an opportunity to terminate monitoring, while allowing other serious child sex offenders to do so.

### A. Lifetime GPS Monitoring Differentially Burdens Fundamental Rights & Fails to Satisfy Strict Scrutiny.

Courts apply strict scrutiny to governmental classifications in two situations: (1) when the classification is based on a "suspect" characteristic, such as race; or (2) when the law burdens a person's exercise of a fundamental right differently depending upon how the person is classified. *See*, *e.g.*, *Cleburne*, 473 U.S. at 440; *Plyler v. Doe*, 457 U.S. 202, 216-17 & nn.14, 15 (1982). Mr. Belleau does not claim that the GPS tracking law classifies based on a suspect characteristic. The law does, however, burden three of his fundamental rights in ways it does not burden the

---

[17] The Court in *Connecticut Dep't of Public Services*, decided on the same day as *Smith v. Doe*, noted that the validity of a sex offender registration requirement under the "substantive component of the Fourteenth Amendment's protections" remained an open question. 538 U.S. at 7-8. Justice Souter, joined by Justice Ginsberg, concurred to note that the Court's rejection of a procedural due process claim "does not immunize" challenges to sex offender regulations under the Equal Protection Clause either. *Id.* at 9-10. Substantive due process and equal protection analyses are closely interrelated. *See Lawrence v. Texas*, 539 U.S. 558, 575 (2002) ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects . . . ."); *Chapman v. United States*, 500 U.S. 453, 465 (1991) ("an argument based on equal protection essentially duplicates an argument based on due process").

fundamental rights of others who are classified differently. Indeed, the law burdens three rights – the right to privacy, the right to First Amendment association, and the right to travel – that are among the paradigmatic "fundamental" rights triggering strict scrutiny. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 & n.3 (1976) ("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right . . .," citing cases protecting "right of a uniquely private nature," "right of interstate travel," and "rights guaranteed by the First Amendment"). Its classifications are thus subject to strict scrutiny, and must accordingly be "precisely tailored" (or "necessary") to serve a "compelling government interest" in order to survive this Court's review. *Plyler*, 457 U.S. at 216-17; *see also Doe v. Edgar*, 721 F.2d 619, 622 (7th Cir. 1983) ("Under traditional equal protection doctrine, a classification will be subject to strict scrutiny, and upheld only if necessary to promote a compelling governmental interest, if it impinges on a fundamental right . . . .")..

As explained in detail in part II of this brief below, GPS tracking infringes on Mr. Belleau's fundamental privacy rights protected by the Fourth Amendment. The United States Constitution also protects certain fundamental associational rights. Specifically, the Supreme Court's "decisions have referred to constitutionally protected 'freedom of association' in two distinct senses." *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984). In one line of cases, the Court has held that "certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* at 617-618. This right to "intimate association" comprehends those "personal affiliations . . . that attend the creation and sustenance of family," and similar close relationships that "are distinguished by such attributes as relative

smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 619-620. A second line of cases recognizes "a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618. This right to "First Amendment" association obviously includes membership in a church or political organization, but also includes relationships geared toward advancing or securing rights, such as the attorney-client relationship, *see, e.g.*, *Denius v. Dunlap*, 209 F.3d 944, 953-54 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); *Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 795 (7th Cir. 2005) ("The freedom of association embodied in the First Amendment also protects Simmons's right to meet with his attorney."), and the doctor-patient or therapist-patient relationship. *See Conant v. Walters*, 309 F.3d 629, 636-37 (9th Cir. 2002) (recognizing "core First Amendment values of the doctor-patient relationship").

Such associational rights may be infringed not only by direct government prohibitions or penalties, but also by involuntary exposure of the existence or key aspects of the relationship. Thus, "disclosure of the fact of membership in a group" is one of the sorts of "[g]overnment actions that may unconstitutionally infringe upon" First Amendment associational rights. *Roberts*, 468 U.S. at 622-23; *see also NAACP v. Alabama*, 357 U.S. 449, 46162 (1958) ("The fact that Alabama . . . has taken no direct action . . . to restrict the right of petitioner's members to associate freely [] does not end the inquiry into the effect of the production order. . . . [C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other forms of government action]. This Court

has recognized the vital relationship between freedom to associate and privacy in one's associations.") (internal citations and quotations omitted).

Here, the government can use GPS tracking data to determine when Mr. Belleau visits family members and close friends, when he goes to a clinic or hospital to see a physician, when he goes to a house of worship, and when he visits his attorneys. This disclosure of his associations impermissibly chills his exercise of protected intimate family associational rights and First Amendment associational rights. (PFOF ¶ 36 (knowing that DOC can learn he has gone to certain places deters him from doing so)); *United States v. Jones*, 565 U.S. __, 132 S.Ct. 945, 956 (2012) (Sotomayor J. concurring) ("Awareness that the Government may be watching chills associational and expressive freedoms.").

The Supreme Court has held that the right to interstate travel is a fundamental right. *Shapiro v. Thompson*, 394 U.S. 618, 629-30 (1969). Although the Court has reserved the question whether the United States Constitution protects a fundamental right to *intrastate* travel, *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 255-56 (1974), the Wisconsin Supreme Court has recognized a fundamental right to intrastate travel within the state Constitution. *See Brandmiller v. Arreola*, 199 Wis. 2d 528, 539-40, 544 N.W.2d 894 (1996) ("[T]he right to travel intrastate is fundamental among the liberties preserved by the Wisconsin Constitution."); *Ervin v. State*, 41 Wis. 2d 194, 200, 163 N.W.2d 207 (1968). In determining that a right to intrastate travel is fundamental, the state Supreme Court stated that the "freedom to move about is a basic right of citizens under our form of government, in fact, under *any system of ordered liberty* worth the name." *Ervin*, 199 Wis. 2d at 200 (emphasis added). This right is closely intertwined with other fundamental rights. "If, for any reason, people cannot walk or drive to their church, their freedom of worship is impaired. If, for any reason, people cannot walk or drive to the meeting

hall, freedom of assembly is effectively blocked." *Id.* The federal constitution's "system of ordered liberty" protects the same sorts of interests as the Wisconsin constitution and accordingly should be interpreted to include a fundamental right to travel intrastate.

As with the right of association, the government can burden exercise of the right to travel not only by direct prohibition or penalty, but by indirect means as well. *See Memorial Hospital*, 415 U.S. at 254-257; *see also Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982) ("In addition to protecting persons against the erection of actual barriers to interstate movement, the right to travel, when applied to residency requirements, protects new residents of the state from being disadvantaged . . . "). Here, although Mr. Belleau is not directly prohibited from traveling, the constant surveillance of his movements has the effect of discouraging certain movements that would disclose information he would prefer to keep private.

Because lifetime GPS tracking burdens these fundamental rights, the classifications employed by the statute must satisfy strict scrutiny – that is, its discriminatory treatment must be necessary to advance a compelling state interest. Laws that are overinclusive or underinclusive fail strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) ("[E]ven were the governmental interest compelling, the ordinances are not drawn in narrow terms to accomplish those interests. . . . [The] ordinances are overbroad or underinclusive in substantial respects.") A policy that is "overinclusive . . . does more harm to the members of the discriminated-against group than necessary to attain the legitimate goals of the policy," and one that is "underinclusive . . . exclud[es] other, very similar groups" from its coverage. *Baskin v. Bogan*, 766 F.3d 648, 656 (7th Cir. 2014).

The GPS law purports to impose its burdens on sex offenders to protect public safety and prevent crime – undoubtedly compelling governmental interests – but it is both over-inclusive

and under-inclusive, and thus is not narrowly tailored to achieve this purpose. The lifetime GPS tracking statute is underinclusive because it does not apply to a potentially large number of offenders who may pose as great or even a greater threat than those to whom it does apply. Lifetime GPS tracking is not imposed on those who commit other serious crimes – such as assault, murder or attempted murder – that do as much or more harm to individuals and society as sexual offenders. The presumption underlying the imposition of lifetime GPS tracking on sex offenders and not other criminals – that sex offenders are more likely to reoffend than other offenders – has been shown to be empirically false. High recidivism rates among sex offenders are often cited in support of strict sex offender regulations, but "[i]n reality, the most current research indicates that sex offenders, as a group, reoffend less than other criminal offenders." Tennen, "Risky Policies: How Effective Are Restrictions on Sex Offenders in Reducing Reoffending?" 58 Boston Bar J. 25, 27 (Fall 2014). The Department of Justice found that only 5.3% of sex offenders were rearrested for a new sex crime within three years after release from prison. Bureau of Justice Statistics, *Recidivism of Sex Offenders Released From Prison in* 1994, 24 (2003). Similarly, the State of Connecticut found that sexual recidivism rates after five years were 3.6% for rearrest and 2.7% for a new sex offense conviction – "much lower than what many in the public have been led to expect or believe. These low re-offense rates appear to contradict a conventional wisdom that sex offenders have very high sexual re-offense rates." Office of Policy and Management, *Recidivism among sex offenders in Connecticut* (2012) http://www.ct.gov/bopp/lib/bopp/sex_offender_recidivism_2012_final.pdf. The Indiana Department of Correction reported that only 1.05% of released sex offenders returned to prison for a new sex offense within three years. Indiana Dep't of Corr., *Recidivism Rates Decrease for 3rd Consecutive Year* (2009) http://www.in.gov/idoc/files/IDOCRecidivism.pdf. And while the

2011 national recidivism rate for all offenders (non-sexual and sexual combined) was 40%, the rate was 13% for adult sex offenders. Human Rights Watch, *Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the US* (2013) http://www.hrw.org/sites/default/files/reports/us0513_ForUpload_1.pdf.

The statute is also overinclusive because it requires people like Mr. Belleau – who because of his age, the remoteness of his offenses in the 1980s, and his years in the community without reoffending, poses an extremely low risk of recidivism – to be subject to lifetime GPS tracking without any showing of current dangerousness and without any opportunity to demonstrate that tracking is no longer necessary.

### B. Excluding Persons Subject to Lifetime GPS Pursuant to Wis. Stat. § 348.48(2)(b) from Opportunity to Terminate Has No Rational Basis.

In general, when reviewing "social or economic legislation," classifications "will be sustained" if they are "rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. However, even under rational basis review, a "[s]tate may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives—such as a bare desire to harm a politically unpopular group—are not legitimate state interests." *Id.* at 446-47; *see also Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993) (relationship between classifications and governmental interests "must find some footing in the realities of the subject addressed by the legislation"). There must be a legitimate purpose for the disparate treatment of the disfavored class. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535-38 (1973) (evaluating federal government's interest in *excluding* unrelated household from food stamp benefits, not in maintaining food stamps for related households); *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013) (there must be "a

'rational relationship between the *disparity of treatment* and some legitimate governmental purpose'") (emphasis added).

Other "serious child sex offenders" subject to lifetime GPS monitoring may, if they are not convicted of a crime while on tracking, petition a court for termination of monitoring. Wis. Stat. §§ 301.48(6)(a) & 301.48(6)(b)1 & 2. If the court determines that lifetime tracking is no longer necessary to protect the public, it may terminate the offender's tracking requirement. Wis. Stat. §§ 301.48(6)(d) – (h). In contrast, Wis. Stat. § 301.48(6)(b)3 prohibits persons, such as Mr. Belleau, who are placed on GPS monitoring after discharge from confinement under Ch. 980, from petitioning for termination of monitoring.

There is no rational basis for depriving some "serious child sex offenders," such as Mr. Belleau, of an opportunity to terminate monitoring by demonstrating that lifetime GPS tracking is no longer necessary to protect the public, while allowing other offenders subject to GPS for the very same serious child sex offenses to do so. Although Mr. Belleau was once designated a "sexually violent person" under Wis. Stat. Ch. 980 – and incorrectly so designated, according to Defendants' expert (PFOF ¶ 10) – he is no longer, and so stands identically situated to other offenders who are on tracking for identical crimes. But those offenders can petition for termination of GPS tracking, while Mr. Belleau cannot, even though he, like them, is not a "sexually violent person."

The arbitrariness of the distinction suggests that its real motivation is a "bare desire to harm a politically unpopular group," *Cleburne*, 473 U.S. at 446-47 – those labeled by the Ch. 980 statute as "sexually violent persons" – to score easy political points for being "tough on crime." The Equal Protection Clause functions to ferret out and prohibit just such political scapegoating:

> [T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

*Railway Express Agency v. New York*, 336 U.S. 106, 112-113 (1949) (Jackson, J., concurring).

Because the discrimination against Mr. Belleau as a sex offender and as a person once labeled a "sexually violent person" is not sufficiently tailored to advance sufficiently important government purposes, it must be invalidated under the Equal Protection Clause.

## CONCLUSION

For the reasons set forth above, Mr. Belleau respectfully requests that this Court declare Wis. Stat. § 301.48 unconstitutional as applied to him and enjoin defendants from enforcing it against him.

Dated this 16th day of February, 2015.

By: /s Laurence J. Dupuis
Laurence J. Dupuis
State Bar No. 1029261
ACLU of Wisconsin Foundation
207 East Buffalo St., #325
Milwaukee, WI 53202-5712
(414) 272-4032
ldupuis@aclu-wi.org

James A. Walrath
State Bar No: 1012151
Law Offices of James A. Walrath, LLC.
324 E. Wisconsin Ave., #1410
Milwaukee, WI 53202
Telephone: (414) 202-2300
Email: jw@jaw-law.com

Attorneys for Plaintiff Michael J. Belleau