**DUPUIS DECLARATION EXHIBIT I**

![BI - A GEO Group Company]

Providing Government with Proven Technology and Treatment Solutions

    
# Prison Without Walls

**News and Events**
- Overview
- Press Releases
- Press Room
- In the News
- White Papers
- Industry Reports
- Trade Shows and Events
- Newsletter

Incarceration in America is a failure by almost any measure. But what if the prisons could be turned inside out, with convicts released into society under constant electronic surveillance? Radical though it may seem, early experiments suggest that such a science-fiction scenario might cut crime, reduce costs, and even prove more just.

One snowy night last winter, I walked into a pizzeria in Morrisville, Pennsylvania, with my right pant leg hiked up my shin. A pager-size black box was strapped to my sockless ankle, and another, somewhat larger unit dangled in a holster on my belt. Together, the two items make up a tracking device called the BI ExacuTrack AT: the former is designed to be tamper-resistant, and the latter broadcasts the wearer's location to a monitoring company via GPS. The device is commonly associated with paroled sex offenders, who wear it so authorities can keep an eye on their movements. Thus my experiment: an online guide had specified that the restaurant I was visiting was a "family" joint. Would the moms and dads, confronted with my anklet, identify me as a possible predator and hustle their kids back out into the cold?

Well, no, not in this case. Not a soul took any notice of the gizmos I wore. The whole rig is surprisingly small and unobtrusive, and it allowed me to eat my slice in peace. Indeed, over the few days that I posed as a monitored man, the closest I came to feeling a real stigma was an encounter I had at a Holiday Inn ice machine, where a bearded trucker type gave me a wider berth than I might otherwise have expected. All in all, it didn't seem like such a terrible fate.

Unlike most of ExacuTrack's clientele, of course, I wore my device by choice and only briefly, to find out how it felt and how people reacted to it. By contrast, a real sex offender—or any of a variety of other lawbreakers, including killers, check bouncers, thieves, and drug users—might wear the unit or one like it for years, or even decades. He (and the offender is generally a "he") would wear it all day and all night, into the shower and under the sheets—perhaps with an AC adapter cord snaking out into a wall socket for charging. The device would enable the monitoring company to follow his every move, from home to work to the store, and, in consultation with a parole or probation officer, to keep him away from kindergartens, playgrounds, Jonas Brothers concerts, and other places where kids congregate. Should he decide to snip off the anklet (the band is rubber, and would succumb easily to pruning shears), a severed cable would alert the company that he had tampered with the unit, and absent a very good excuse he would likely be sent back to prison. Little wonder that the law-enforcement officer who installed my ExacuTrack noted that he was doing me a favor by unboxing a fresh unit: over their lifetimes, many of the trackers become encrusted with the filth and dead skin of previous bearers, some of whom are infected with prison plagues such as herpes or hepatitis. Officers clean the units and replace the straps between users, but I strongly preferred not to have anything rubbing against my ankle that had spent years rubbing against someone else's.

Increasingly, GPS devices such as the one I wore are looking like an appealing alternative to conventional incarceration, as it becomes ever clearer that, in the United States at least, traditional prison has become more or less synonymous with failed prison. By almost any metric, our practice of locking large numbers of people behind bars has proved at best ineffective and at worst a national disgrace. According to a recent Pew report, 2.3 million Americans are currently incarcerated—enough people to fill the city of Houston. Since 1983, the number of inmates has more than tripled and the total cost of corrections has jumped sixfold, from $10.4 billion to $68.7 billion. In California, the cost per inmate has kept pace with the cost of an Ivy League education, at just shy of $50,000 a year.

This might make some sense if crime rates had also tripled. But they haven't: rather, even as crime has fallen, the sentences served by criminals have grown, thanks in large part to mandatory minimums and draconian three-strikes rules—politically popular measures that have shown little deterrent effect but have left the prison system overflowing with inmates. The vogue for incarceration might also make sense if the prisons repaid society's investment by releasing reformed inmates who behaved better than before they were locked up. But that isn't the case either: half of those released are back in prison within three years. Indeed, research by the economists Jesse Shapiro of the University of Chicago and M. Keith Chen of Yale

indicates that the stated purpose of incarceration, which is to place prisoners under harsh conditions on the assumption that they will be "scared straight," is actively counterproductive. Such conditions—and U.S. prisons are astonishingly harsh, with as many as 20 percent of male inmates facing sexual assault—typically harden criminals, making them more violent and predatory. Essentially, when we lock someone up today, we are agreeing to pay a large (and growing) sum of money merely to put off dealing with him until he is released in a few years, often as a greater menace to society than when he went in.

Devices such as the ExacuTrack, along with other advances in both the ways we monitor criminals and the ways we punish them for their transgressions, suggest a revolutionary possibility: that we might turn the conventional prison system inside out for a substantial number of inmates, doing away with the current, expensive array of guards and cells and fences, in favor of a regimen of close, constant surveillance on the outside and swift, certain punishment for any deviations from an established, legally unobjectionable routine. The potential upside is enormous. Not only might such a system save billions of dollars annually, it could theoretically produce far better outcomes, training convicts to become law-abiders rather than more-ruthless lawbreakers. The ultimate result could be lower crime rates, at a reduced cost, and with considerably less inhumanity in the bargain.

Moreover, such a change would in fact be less radical than it might at first appear. An underappreciated fact of our penitentiary system is that of all Americans "serving time" at any given moment, only a third are actually behind bars. The rest—some 5 million of them—are circulating among the free on conditional supervised release either as parolees, who are freed from prison before their sentences conclude, or as probationers, who walk free in lieu of jail time. These prisoners-on-the-outside have in fact outnumbered the incarcerated for decades. And recent innovations, both technological and procedural, could enable such programs to advance to a stage where they put the traditional model of incarceration to shame.

In a number of experimental cases, they already have. Devices such as the one I wore on my leg already allow tens of thousands of convicts to walk the streets relatively freely, impeded only by the knowledge that if they loiter by a schoolyard, say, or near the house of the ex-girlfriend they threatened, or on a street corner known for its crack trade, the law will come to find them. Compared with incarceration, the cost of such surveillance is minuscule—mere dollars per day—and monitoring has few of the hardening effects of time behind bars. Nor do all the innovations being developed depend on technology. Similar efforts to control criminals in the wild are under way in pilot programs that demand adherence to onerous parole guidelines, such as frequent, random drug testing, and that provide for immediate punishment if the parolees fail. The result is the same: convicts who might once have been in prison now walk among us unrecognized—like pod people, or Canadians.

There are, of course, many thousands of dangerous felons who can't be trusted on the loose. But if we extended this form of enhanced, supervised release even to just the nonviolent offenders currently behind bars, we would empty half our prison beds in one swoop. Inevitably, some of those released would take the pruning-shears route. And some would offend again. But then, so too do those convicts released at the end of their brutal, hardening sentences under our current system. And even accepting a certain failure rate, by nearly any measure such "prisons without bars" would represent a giant step forward for justice, criminal rehabilitation, and society.

In the 18th century, the English philosopher and social theorist Jeremy Bentham designed the Panopticon, a hypothetical prison. Inside the Panopticon (the name is derived from the Greek word for "all-seeing"), the prisoners are arranged in a ring of cells surrounding their guard, who is concealed in a tower in the center. The idea is that the guard controls the prisoners through his presumed observation: they constantly imagine his eyes on them, even when he's looking elsewhere. Bentham promoted the concept of the Panopticon for much the same reasons that spur criminal-justice innovation today—a ballooning prison population and the need for a cheap solution with light manpower demands. Whereas the guard in Bentham's day had only two eyes, however, today's watcher can be virtually all-seeing, thanks to GPS monitoring technology. The modern prisoner, in other words, need not wonder whether he is being observed; he can be sure that he is, and at all times.

The hub of the American penal system's largest open-air Panopticon is in the Indianapolis suburb of Anderson, population 57,496, at the call center of a company called BI Incorporated. The firm manufactures and services the ankle device I test-drove, as well as a suite of other law-enforcement gadgets designed to track offenders. Though BI has a handful of rivals in the monitoring business, it is the most prominent and best-known, with 55,000 offenders wearing BI anklets at any given moment. (The company monitors another 10,000 using lower-tech means: for instance, by having them call from particular landlines at designated times.)

I drove to Anderson from Indianapolis, past clapboard houses and cornfields, to visit BI's offices, located on a few discreet and highly secure floors above the local branch of KeyBank. I was buzzed up to meet Jennifer White, the BI vice president in charge of monitoring. From her office window, we looked out not on the backs of the 30,000 offenders this branch monitors, but on the sedate midwestern bedroom community that is, by her description, "a little bit less happening than Muncie," 20 miles away. Even the sleepy streets of Anderson have their secrets, though. White told me that below us were about 120 criminals with BI anklets—roughly one for every 500 residents in the town.

White, an Indiana native, has been at BI since 1988. Over a turkey salad from Bob Evans, she explained that the company's first "clients" (as the monitored are always called) were not human beings but Holsteins. In 1978, BI began selling systems that allowed dairy farmers to dispense feed to their cows

automatically. The company fitted a radio-frequency tag on each cow's ear so that when the cow approached the feed dispenser, a sensor in the latter caused it to drop a ration of fodder. If the same cow returned, the sensor recognized the unique signal of the tag and prevented the cow from getting a second helping until after enough time had passed for her to digest the first. (The worlds of bovine and criminal management have in fact been oddly intertwined for many years. Just as modern abattoirs have studied the colors that can distract and agitate cows during their final moments—thus ruining their meat with adrenaline—prisons have painted their walls in soothing shades to minimize anxiety and aggression in their inmates.)

In the 1980s, BI expanded into "tethering people." As an early mover in the outpatient prison industry, BI grew fast, and the Anderson office contains a one-room museum of the bulky devices from its early days, some the size of a ham-radio set. The company now counts tracking people as its core business, and as a sideline it facilitates their reentry into society, through treatment programs and counseling. BI monitors criminals in all 50 states, "everyone from people who owe child support to ax murderers," White told me. Most use the lowest-tech tracking equipment, a radio-frequency-based technology that monitors house arrest. The system works simply: you keep a radio beacon in your home and a transmitter around your ankle. If you wander too far from your beacon, an alert goes out to the BI call center in Anderson, which then notifies your probation officer that you have left your designated zone—as Martha Stewart allegedly did during her BI-monitored house arrest in 2005, earning a three-week extension of her five-month sentence.

The truly revolutionary BI devices, though, are the new generation of GPS trackers, which monitor criminals' real-time locations down to a few meters, enabling BI to control their movements almost as if they were marionettes. If you were a paroled drunk driver, for instance, your parole officer could mandate that you stay home every day from dusk until dawn, be at your workplace from nine to five, and go to and from work following a specific route—and BI would monitor your movements to ensure compliance. If your parole terms included not entering a bar or liquor shop, the device could be programmed to start an alert process if you lingered near such a location for more than 60 seconds. That alert could take the form of an immediate notice to the monitors—"He's at Drinkie's again"—or even a spoken warning emanating from the device itself, instructing you to leave the area or face the consequences. Another BI system, recently deployed with promising results, features an electrostatic pad that presses against the offender's upper arm at all times, chemically "tasting" sweat for signs of alcohol. (In May, starlet Lindsay Lohan was ordered to wear a similar device, manufactured by a BI competitor, after violating her probation stemming from DUI charges.)

To see the BI systems at work is to realize that Jeremy Bentham was thinking small. The call center consists of just a few rows of desks, with a dozen or so men and women wearing headsets and speaking in Spanish and English to their "customers" (the law-enforcement agents, as distinguished from the tracked "clients"). Each sits in front of a computer monitor, and at the click of a mouse can summon up a screen detailing the movements of a client as far away as Guam, ensuring not only that he avoids "exclusion zones"—schoolyards or bars or former associates' homes, depending on the circumstances—but also that he makes his way to designated "inclusion zones" at appointed times.

As a fail-safe against any technological glitch, whether accidental or malicious, BI is immensely proud of its backup systems, which boast an ultrasecure data room and extreme redundancy: if, say, a toxic-gas cloud were to wipe out the town of Anderson, the last act of the staff there would be to flip the switches diverting all call traffic to BI's corporate office in Boulder, Colorado, where a team capable of taking over instantly in case of disaster is always on duty.

I asked Jamie Roberts, a call-center employee who had previously been a BI customer as a corrections officer in Terre Haute, Indiana, to show me a parolee on the move, and in seconds he pulled up the profile of a criminal in Newport News, Virginia. The young man's parole officer had used a Microsoft Bing online map to build a large irregular polygon around his high school—an inclusion zone that would guarantee an alert if he failed to show up for class on time, every day. Roberts showed me one offender after another: names and maps, lives scheduled down to the minute. There was a gambler whose anklet was set to notify Roberts if the client approached the waterfront, because he might try his luck on the gaming boats; an addict who couldn't return to the street corners where he used to score crack; and an alcohol abuser who had to squeeze himself into an inclusion zone around a church basement for an Alcoholics Anonymous meeting from 9 to 10 p.m., three times a week.

A strict parole officer could plausibly sketch out a complete weekly routine for his parolee, with specific times when he would have to leave home and specific stations he would have to tag throughout the week. He might allow, or even require, the parolee to go to the grocery store on a Sunday afternoon, and go for a jog along an authorized route every morning. Roberts pulled up another Bing map for me, and set in motion a faster-than-real-time playback of one client's day. As his dot carefully skirted the exclusion zones around a school and a park, staying away from kids because of the absolute certainty that BI would report him if he did not, his life on the outside looked fully set out in advance, as if he moved not on his own feet but on rails laid by his parole officer. For BI clients, technology has made detection of any deviation a near certainty—and with detection a swift response, one that often leads straight back to the Big House.

Criminals typically differ from the broader population in a number of ways, including poor impulse control, addictive personality, and orientation toward short-term gratification rather than long-run consequences. More than a fifth of all incarcerated criminals are in for drug offenses, and a large portion of the others abuse legal and illegal substances. If one were to design a criminal-justice system from scratch with these characteristics in mind, it would be difficult to come up with something less effective than what we have

today.

Take the world of supervised release, for example. With some exceptions (BI clients prominent among them), parolees and probationers know that if they violate the terms of their release, they are unlikely to be caught—and even less likely to be punished. So, impulsive as many of them are, they will transgress, perhaps modestly at first, but over time with growing recklessness, until many have resumed the criminal habits—drug use, theft, or worse—that got them arrested in the first place.

This prevailing condition is something Mark A. R. Kleiman, a professor of public policy at the University of California at Los Angeles and a leading advocate of non-prison alternatives, calls "randomized severity": some transgressors will be punished for violations, sometimes quite harshly, but others will not be punished at all, whether because their delinquencies go undetected or because judges, police, and parole officers decline to pursue the severe penalties that could apply. In his 2009 book, When Brute Force Fails, Kleiman argues that such capricious enforcement undermines efforts to reduce crime, and moreover that tough penalties—such as the long sentences that have contributed to clogged prisons—don't do much to help, despite their high cost. The alternative, Kleiman suggests, is a paradigm called "swift and certain" justice, first proposed by Cesare Beccaria in the 18th century: immediate, automatic penalties—though not necessarily severe ones—doled out by credible, identifiable figures.

One way to achieve this result is through monitoring devices like those supplied by BI. But a pioneering judge in Hawaii has demonstrated that it can also be accomplished without the technological assist. In the early 2000s, Steven Alm, a circuit judge in Honolulu, grew increasingly frustrated with what he viewed as a farcical probation system. The majority of the cases he saw were drug-related offenses, including property crimes such as burglaries and thefts from tourists' rental cars. Many of the defendants in his court received probation, but once they were back on the street, they might as well never have been convicted. Drug tests, for instance, were scheduled a full month in advance, even though the test could detect meth use only within the previous three days. Despite this, probationers still tested positive about half of the time, indicating that they couldn't stay clean for even that short interval.

One reason for the backsliding, presumably, was that violators knew that in practice they had little to fear. Probation officers had limited time and resources, and to ask for a convict's probation to be revoked would require a great deal of work. Moreover, officers weren't always eager to send someone to prison for five years just for getting high. Since the probationers viewed the enforcers of their probation as lenient, overworked, and somewhat unpredictable, they correctly assumed there was a good chance they could get away with toking up at will.

Then, in 2004, Judge Alm decided to test the "swift and certain" paradigm. "It's something we always talk about in the sociology classes," he told me. "It just never happens in the criminal-justice system." Alm, a former U.S. attorney who was born in Hawaii, instituted what academics such as Kleiman describe as one of the most innovative and successful alternatives to incarceration in recent years. The basic tenet will be familiar to anyone who has ever trained a puppy: punishment must be consistent and immediate, in order to maintain a clear linkage between transgression and consequences. Alm began by assembling 34 probationers chosen because their profiles suggested they were especially incorrigible. He told them: "Everybody in this courtroom wants you to succeed on probation. But for you not to be in prison means you are making a deal with me to follow the rules. If you don't want to follow the rules, tell me now, and I will send you to prison."

The rules were simple: each probationer had to call in to the courthouse every weekday to find out whether he was required to come in for an observed urine test. These tests occurred frequently, and if a probationer ever failed a test or failed to report for a test or a meeting with his probation officer, he was locked away for two days and hauled before the judge for immediate continued sentencing. The justice system under Alm was a consistent and unforgiving machine, dispensing instant punishment for every transgression. The effect was to make life on the outside a little more like life on the inside, with strict, regular monitoring of everyone in the system. If you used illegal drugs, you would be caught.

Alm worked with Kevin Takata, a supervisor in the prosecutor's office, to come up with a form that reduced the paperwork time for demanding a probation modification from hours or days to minutes. And rather than require a complete overhaul of the terms of a violator's probation, the judge simply handed down jail time. In practice, the sentences were not especially long—days or weeks, in most cases—but, as Kleiman argues, it was not the duration of punishment but the certainty that was crucial.

The results of Alm's program, called Hawaii's Opportunity Probation with Enforcement, or HOPE, astonished everyone. The probationers shaped up quickly, and over time they showed remarkably little inclination to go astray. The urine tests came back dirty a tenth as often as before. "We discovered that most of these guys can stop using on their own," Alm explained, given the discipline imposed by HOPE. For most probationers, the strict observation was as good as, or better than, any drug-treatment program. It generally took no more than one stint in jail before an offender realized that the consequences of a relapse were real; second violations were unusual. And according to a study co-authored by Kleiman, recidivism —that is, arrests for the commission of new crimes, rather than just violations of probation—dropped by half.

Alm was inherently skeptical that prison is the appropriate remedy for many types of offenses. "You don't want to send a 20-year-old who's driving a stolen car and has a little dope on him when he's caught to prison," he said. "He's not going to come out better. I belong to the school of judge-thought that says we

should be sending to prison the people we are afraid of, or who won't stop stealing."

Probation officers started volunteering their problem cases to Alm's court, and now all of his cases—more than 1,300—are HOPE probationers. Still more remarkable, the demands of the program—constant testing, appearances before the judge—have not overwhelmed the court system. Violators come in to see the judge, and attorneys complain about having to show up for hearings over even the smallest violations of probation. But overall, the court's volume of work per offender has declined, as has the cost to the state. "You can get someone out working, versus having the state lock them up at a cost of $35,000 per year," explained Myles Breiner, the president of Hawaii's association of criminal defense lawyers. "Who wants to spend more money on the Corrections Corporation of America?"

Outside Hawaii, prison analysts are cautiously optimistic. "Certainly it should be tried in other jurisdictions," said Gerald Gaes, a social scientist and former director of research at the Bureau of Prisons in Washington, D.C., though he was quick to caution that certain aspects of Hawaii may make the state unique in the U.S. criminal-justice system, and therefore its experience may not be generalizable to the country at large. To date, no other state has attempted a program as streamlined as HOPE, or as capable of meting out swift and certain punishment. But Alm is evangelizing aggressively. This year, he met with Attorney General Eric Holder and testified before a House subcommittee on crime about the possibility of expanding HOPE nationwide. "Down the road, I'm convinced: probation, pre-trial, parole," he said. "We try to use best practices. Well, this truly is the best practice."

Alm's program certainly seems effective—much like BI's technological solution to a similar set of problems. But as I stood in the security line at the courthouse where HOPE probationers report to urinate each morning, I couldn't help but wonder how much the constant monitoring takes over their lives, and whether this carefully demarcated kind of freedom is more wearying than it appears. Some of the probationers had come in from an hour away to take their test, and they all had to monitor, on pain of incarceration, whether there was ever a whiff of spliff in the air at their friends' places.

Back on the mainland, I asked law-enforcement officers and BI personnel, who have installed hundreds of monitoring anklets, how their clients first reacted when they felt the cinch of the band around their ankle and knew that, from that moment, they would be under constant surveillance. In most cases, Jennifer White told me, "they are just relieved to be at home and with their families and working." Some were even grateful, because the device gave them an excuse to avoid criminal friends: after all, no one wants to commit a crime with an accomplice who's being monitored. But not all were so upbeat. Some cursed. Others wept.

If the future of prisons is to be turned inside out, with criminals in the wild and their guards in a suburban midwestern office, how will the experience of being a convict change? The psychology of incarceration is well known not only to researchers, but to readers of Dostoyevsky and viewers of Oz. But to have your every step monitored as you make your way through life, ostensibly free—well, that is, so to speak, a brave new world.

In Anthony Burgess's novel A Clockwork Orange, a dystopian British prison-state famously brainwashes a sociopathic youth into feeling physically ill at the very thought of inflicting pain. But he ultimately crumbles at the violence around him, and the state is forced to un-brainwash him. BI is of course installing its devices on the ankle, not in the mind. But the real purpose of any form of Panopticon justice—that is, the certainty of discovery and punishment—is to force the criminal to monitor himself. The Panopticon effectively outsources the role of prison guard to the prisoners themselves. And to be constantly on watch may wear at the psyche in ways difficult to predict. In a boast that could also serve as a warning, Bentham himself described his Panopticon as offering "a new mode of obtaining power of mind over mind, in a quantity hitherto without example."

In February, I visited Trenton, New Jersey, to observe a BI client in his native environment and to find out how life is for a man in a prison without bars. The New Jersey State Parole Board monitors about 250 sex offenders via GPS, and has had great success, in terms of cost and results, as a BI customer. The board's public-information officer, Neal Buccino, offered to introduce me to a local child-molester, who allowed me to attend his regular parole meeting on the condition that I not use his real name. I will call him Mick.

Mick was 57, with a bad back, rotten teeth, and hepatitis. He'd worn a BI tracker for two years. When he walked in from the icy streets of Trenton, my eyes darted to the electronic components hanging off his leg and clothing, and I sympathized with him immediately. Mick had tried to kill himself a few months earlier in a bout of depression, possibly brought on by poverty and estrangement from his son and daughter, both of whom he had been convicted of molesting. He was tall and lanky, with glasses and a moustache, and, in the way of some depressives, was disarmingly funny. If I'd met Mick in the hallway of my apartment building, I would have thought he was there to fix the heater.

His parole officer, an intelligent young guy named John Goldin, meets Mick weekly to confirm where he has been, and why. He started by checking off the signs that Mick had kept away from kids and continued living his desperate and carefully observed life. "Any contact with police?" Goldin asked. "Drugs? Alcohol? Minors?"

Mick gave four quick, weary Nos.

Did Mick still plan to go fishing to supplement the $480 he had left over from his monthly disability payment after he paid child support? Were bedbugs still feasting on him and the other residents of his rooming house? Why had he gone to Broad Street on Wednesday?

Mick answered the questions with the resignation of someone who had become used to explaining every minute of his life to a man barely half his age. Yes, he was going to start fishing again. The bedbugs were gone for now. He'd gone to Broad Street to visit the TD Bank and count the loose change he'd found on the street.

As for the anklet itself, he told me his diabetes made him worry about where the band rubbed his skin. "I can't afford no infections," he said. In the summer, when the weather was hot and he didn't wear long pants to conceal his tracker, he said the stares were constant: "I get tired of people asking me every day, 'That a phone?' I mean, shut the fuck up."

Mick said he had trouble visiting his mother in her retirement home, because she worried about explaining why her son always wore a device on his leg. "She gets upset, and I can't say that I blame her," he said dejectedly. "It feels like it has grown into my skin sometimes." It seemed also to have grown into his brain.

Whatever its merits, the idea of increasing the number of free-range felons such as Mick is unlikely to make for good politics. Willie Horton still haunts the dreams of every aspiring politician. Even Steven Alm says it was largely his reputation as a former prosecutor and "hanging judge" that enabled him to institute HOPE, since no one could plausibly accuse him of being soft on crime. "I'm convinced this is one of those Nixon-in-China things," he explained. "If I hadn't been a career prosecutor, there's no way the law-enforcement people would have gotten on board."

Nevertheless, there are moves under way to experiment with HOPE-like programs outside Hawaii. In addition to the conversations Alm has held with Attorney General Holder, legislation introduced by Representatives Adam B. Schiff (a California Democrat) and Ted Poe (a Texas Republican) would establish a competitive grant program to provide seed money for HOPE-style probation systems. Small programs are in place in Nevada and Oregon, and Alaska launched its own effort this summer. And the market for monitoring devices seems destined to expand, as the technology involved becomes more widespread and hardware costs continue to fall. Already, I have an application on my iPhone that broadcasts my exact location to selected friends at all times. If I were ever convicted of a crime and forced to submit to GPS tracking, I would, in theory, need only to add my probation officer to my Google Friends list and keep my phone handy. (When I showed the app to BI's Jennifer White, she had trouble fathoming that anyone would use such a thing without a court order. "Do you keep that on all the time?" she asked suspiciously.) And with prison costs rising, and the pernicious effects of incarceration becoming clearer all the time, the problem of selling prisons without walls will presumably grow easier over time.

There are also, of course, worries about the creeping power of government, and the routinization of surveillance. Right now, BI monitors mostly offenders who have done something seriously wrong, and although its anklets enable parole and probation officers to lay down very specific location itineraries, in practice most just mark off home and work spaces. But there is no reason, as the technology gets cheaper and the monitoring ever more fine-grained, why electronic monitoring could not be used to impose an ever wider range of requirements on an ever wider range of "criminals." A serious felon might have every second of his day tracked, whereas a lighter offender like myself—recently caught lead-footed by a traffic camera—might be required to carry a tracker that issues an alert any time I move faster than 65 miles per hour. (If such an intervention sounds far-fetched, recall that many jurisdictions in the United States already require convicted drunk drivers to pass an ignition-mounted Breathalyzer test before they can start their cars.)

The technology is already largely in place for such forms of Big Brother surveillance. In theory, they'd require little more than a creative judge to impose them, and someone behind a monitor in an office somewhere to enforce them. And that's before you even begin spinning out the science-fiction scenarios, which themselves might not be so very far off. Right now the electrostatic patches made by BI and others monitor the sweat of parolees only for alcohol. But why stop there? Despite some practical hurdles, they could perhaps be upgraded to taste other substances, such as amphetamines or other drugs. And if patches can ensure that certain foreign substances remain out of the bloodstream, why not ensure that others are added to it—pharmaceuticals, say, to inhibit libido or muzzle aggression or keep psychosis at bay. They could even, again in theory, police the natural substances in our sweat, our hormones and neurotransmitters, the juices that determine our moods and desires. No machine currently exists that could sniff out criminal intent, or schizophrenia, or sexual arousal, from the armpits of a parolee or probationer, but the forward march of technology suggests that such a device is far from impossible, and that perhaps someday routine monitoring by authorities could be used to map convicts not just geographically but emotionally as well. If, for instance, the parole officer for a convicted rapist saw that his charge was in a state of highly elevated aggression, fear, and arousal, he might ask the police to pay an immediate visit to deter a possible crime—or, perhaps, interrupt a consensual encounter.

Future generations of devices could also be programmed to interact more directly with a client's immediate surroundings. They might, for instance, react to the radio-frequency chips embedded in commercial products for the next generation of retail checkout scanners, and sound a warning if a parolee approached cigarettes like those he once shoplifted, or the liquor he liked to abuse. Or anklets could be set up to react with one another, preventing ex-cons from getting together without sounding an alert. Monitors

could even be sold to store owners or other private citizens to let them know when particular categories of criminals set foot on their property.

These are the kinds of possibilities that give privacy advocates nightmares. Erik Luna, a law professor at Washington and Lee University, is a critic of mandatory sentencing and other measures that have packed U.S. jails, but he urges caution when viewing electronic monitoring as an alternative. "There should be a general concern about the extent of the power of the state to follow and track individuals and gather information about their lives," Luna says. "What is the minimum ambit of privacy, to maintain the level of human dignity that a liberal form of government should provide?"

At the same time, if the people being monitored are those who would otherwise be in prison, then the infringement on their privacy is substantially less intrusive than that entailed in being required to sit in a cell all day. BI's White made exactly this point when I raised the question with her. "They are doing their time in lieu of incarceration," she said, with some exasperation. When I asked whether the privacy concerns of inmates should be considered at all, her answer, in essence, was no: "A person's rights, when they are incarcerated, or a ward of the state, are different from yours and mine."

And what of our rights, those of us outside the realm of the criminal-justice system? If the past several years in the shadow of a war against terrorism have taught us anything, it is that, once available, surveillance technologies rarely go unused, or un-abused. Could yesterday's warrantless wiretapping become tomorrow's clandestine cell-phone tracking? The technology already exists: even a cell phone that lacks a GPS can be traced to within a few city blocks. Once the legal and technical infrastructures were in place to allow the monitoring of criminals, it would be a relatively simple step to extend that monitoring to any person the government considered, for whatever reason, to be "of interest."

For now, of course, none of these scenarios is close to taking place. Even HOPE, a narrow, low-tech program, is limited to Hawaii, and the number of convicts wearing BI's anklets still make up a tiny fraction of those serving time, even outside prison walls. When close monitoring of probationers and parolees emerges as an ever more obvious alternative to expensive incarcerations, we would be wise to remain vigilant against Orwellian abuses. But potential drawbacks and pitfalls notwithstanding, it seems likely that the invasive surveillance model, combining tracking technology and the Kleiman/Alm paradigm of "swift and certain" justice, could offer an alternative to much of the waste—in human as well as economic terms—of our current, dysfunctional system.

In a way, the goal of Panopticon justice is as old as morality itself. It aims to install a tiny voice in each offender's head, a warning that someone is watching and that wrongdoing will be punished. Most of us call that tiny voice a conscience. But for some that voice is overwhelmed by other, louder voices expressing need or impulse or desire, voices less bound by reason or consequence. If a device strapped to an ankle can help restore the balance, can amplify the voice of conscience relative to the others, is that such a bad thing? For optimists of human nature, it is a melancholy realization that the highest function of humanity can be, to some extent, outsourced to a plastic box. But the American criminal-justice system has become in many ways a graveyard of optimism. And surely it is better to outsource the fragile voice of conscience to a plastic box than to do what our brick-and-bar prisons so often do, which is to extinguish that voice altogether.

By Graeme Wood, The Atlantic

Originally at - www.theatlantic.com

Copyright © 2002-2013 BI Incorporated. All rights reserved.    Privacy Policy  •  Legal Notice  •  Service & Warranty