**DUPUIS DECLARATION EXHIBIT M**

```
             UNITED STATES DISTRICT COURT

         FOR THE EASTERN DISTRICT OF WISCONSIN
   ----------------------------------------------------------

   MICHAEL J. BELLEAU,

                      Plaintiff,

             vs.                    Case No. 12-cv-1198(WCG)

   EDWARD F. WALL, in his official capacity
   as Secretary of the Wisconsin
   Department of Corrections, and DENISE
   SYMDON, in her official capacity as the
   Administrator of the Division of
   Community Corrections,

                      Defendants.

   ----------------------------------------------------------




                Deposition of DEBBIE LARRABEE

               Thursday, September 25th, 2014

                          8:38 a.m.

                             at

               WISCONSIN DEPARTMENT OF JUSTICE
                    17 West Main Street
                    Madison, Wisconsin


               Reported by Rachel M. Davis, CSR
```

1          Deposition of DEBBIE LARRABEE, a witness in
2     the above-entitled action, was taken at the instance of
3     the Plaintiff, under and pursuant to the provisions of
4     Chapter 804 of the Wisconsin Statutes, and pursuant to
5     Notice, before me, Rachel M. Davis, CSR and Notary
6     Public in and for the State of Wisconsin, at WISCONSIN
7     DEPARTMENT OF JUSTICE, 17 West Main Street, Madison,
8     Wisconsin, on the 25th day of September, 2014,
9     commencing at 8:38 a.m. and concluding at 12:08 p.m.
10
11                    A P P E A R A N C E S
12              ACLU WISCONSIN FOUNDATION, by
                Mr. James A. Walrath and
13              Mr. Laurence J. Dupuis
                207 East Buffalo Street, Suite 325
14              Milwaukee, Wisconsin 53202
                Appeared on behalf of the Plaintiff,
15
16              WISCONSIN DEPARTMENT OF JUSTICE, by
                Ms. Abigail C.S. Potts
17              17 West Main Street
                Madison, Wisconsin
18              Appeared on behalf of the Defendant.
19
20                          I N D E X
21    EXAMINATION BY                                        PAGE
22    Mr. James A. Walrath                                  4
23
24
25

1　　　　　　　　TRANSCRIPT OF PROCEEDINGS
2　　　　　DEBBIE LARRABEE, called as a witness herein by the
3　　Plaintiff, after having been first duly sworn, was
4　　examined and testified as follows:
5　　　　　　　　　　　E X A M I N A T I O N
6　　BY MR. WALRATH:
7　　Q　　Please state your full name.
8　　A　　Debbie Larrabee.
9　　Q　　And your work address?
10　A　　2565 East Johnson Street, Madison, Wisconsin.
11　Q　　You are employed by whom?
12　A　　Department of Corrections.
13　Q　　How long have you been so employed?
14　A　　21 years.
15　Q　　Have you ever been deposed before?
16　A　　No.
17　Q　　Okay.  A couple of ground rules I would like to go
18　　　　over with you.  If you want to ask any questions
19　　　　about what I am going to say, please feel free.
20　A　　Okay.
21　Q　　And at any time during the deposition if it appears
22　　　　that something is unclear to you, just state that
23　　　　it is unclear and we will try to clear it up.
24　A　　Okay.
25　Q　　You're under oath, as you understand, so please

1     under the supervision of the electronic monitoring
2     center?
3  A  They are not under the supervision of the
4     electronic monitoring center.  Most of them, other
5     than the mandatory lifetime GPS offenders who are
6     no longer on supervision, which I can't give you a
7     number now, I would guess around 250, the rest of
8     them would be under probation parole supervision
9     and would have agents.
10 Q  And what do the people in the monitoring center do,
11    the staff?
12 A  They enroll people into whatever electronic
13    monitoring program the agent has requested, and
14    then they respond to alerts.
15                 If it is during business hours, they
16    will let the agent of record know.  If it is after
17    business hours, they will follow whatever procedure
18    they have in place.
19                 For example, they may issue a
20    warrant, they may ask law enforcement to arrest
21    somebody, et cetera.
22 Q  So how does that differ from the GPS specialist
23    responsibilities that you had?
24 A  The GPS specialist did not supervise.  GPS the
25    monitoring center may get an alert on someone and

```
 1          notify the GPS specialist.
 2    Q     And then what would happen?
 3    A     The GPS specialist would make a decision on how to
 4          respond to the alert.
 5    Q     What kinds of discussions were they -- what were
 6          the options?
 7    A     The most frequent decision was to call the
 8          registrant themselves and say, "You have an alert.
 9          Please do this."
10    Q     And that is what you would do in part of your job;
11          correct?
12    A     Yes.
13    Q     One of the things you would do is call the person
14          under tracking; correct?
15    A     Yes.
16    Q     What were the other options that you had?
17    A     If it was a tamper alert, we may call law
18          enforcement in that area and ask them to check on
19          the registrant and their bracelet to make sure the
20          bracelet is intact.
21    Q     Is that called a welfare check?
22    A     I don't know what they call it.  We wouldn't
23          necessarily -- we may call it a welfare check, but
24          we will tell them why.  "This person is on lifetime
25          GPS.  We have a tamper on their bracelet.  Can you
```

```
 1              zones, parks, or daycares.  I don't recall if he
 2              had an exclusion zone for specific victims.
 3       Q      What kind of record would exist if he were subject
 4              or had been subject to an exclusion zone
 5              requirement?
 6       A      The monitoring center would have that record
 7              because they would have the exclusion zones.  I may
 8              have something in my notes, but I just don't recall
 9              if he was subject to any exclusion zones.
10       Q      I am going to direct your attention to Page 6 of
11              Exhibit 6 and direct your attention to Paragraph
12              10.  Do you see that there?
13       A      Yes.
14       Q      What is that referring to?
15       A      "All GPS MD Registrants shall be placed on an ET-1,
16              no beacon/no downloader."  That is a type of
17              equipment that was -- at this time, is subject to
18              all max discharge registrants but also most
19              mandatory lifetime who are on supervision as well.
20       Q      But the terminology, MD, GPS MD registrants is
21              referring to MD to maximum discharge?
22       A      Yes.
23       Q      And are you saying this paragraph has application
24              currently to persons such as Mr. Belleau?
25       A      That is the type of equipment that they wear, yes.
```

1　Q　What is an ET-1?
2　A　That is the name of the GPS tracking device that
3　　　goes on their ankle.
4　Q　Are you familiar with any other terminology to
5　　　describe that device?
6　A　No.
7　Q　Is "ET" short for ExacuTrack?
8　A　Yes.
9　Q　And I am going to show you what has been marked for
10　　　identification as Exhibit 8.  Do you have that
11　　　before you?
12　A　I am sorry.  Yes.
13　Q　Okay.  Have you seen that before?
14　A　Yes.
15　Q　It refers at the top of BI ExacuTrack.  I misspoke
16　　　previously.  I kind of called it "ExacuTrack."  But
17　　　it is E-X-A-C-U, and then capital, T-R-A-C-K, and
18　　　then the word "One."
19　　　　　　　　That is what Exhibit 8 refers to;
20　　　correct?
21　A　Yes.
22　Q　Is this the same thing as what is referred to in
23　　　Paragraph 10 in Exhibit 6?
24　A　Yes.
25　Q　What does it mean when it says, "No Beacon/no

1　Q　And when those complaints have come in, do you
2　　　record them?
3　A　I usually would have, yes.
4　Q　Would they show up in the inventory that you --
5　　　such as Exhibit 13 that you prepared for
6　　　Mr. Belleau?
7　A　If I recorded it, it would, yes.
8　Q　Okay.  What would have been the complaints?
9　A　I had a variety of complaints from the registrants
10　　　regarding their bracelets.
11　Q　What kind?
12　A　That it was uncomfortable; that they felt it wasn't
13　　　working properly; et cetera.
14　Q　How were they resolved?
15　A　If they were uncomfortable, I would put in a
16　　　request that they switch it to a different ankle to
17　　　give that leg a break.
18　　　　　　　If they complained about their
19　　　equipment and it was determined that it wasn't
20　　　working properly, then we would change the
21　　　equipment.
22　Q　When you would, for example, change the leg that
23　　　the device is worn on, that would have to be
24　　　accomplished by an employee of BI getting in touch
25　　　with the registrant?

```
 1   A      Yes.
 2   Q      And under what circumstances?  How is that set up?
 3   A      Normally I would con- -- normally it was done via
 4          e-mail, an e-mail from me notifying the monitoring
 5          center who would notify the BI installer.  The
 6          installer would then contact the registrant
 7          directly to set up a time.
 8   Q      So the BI employees have access to the locations
 9          and telephone numbers of registrants?
10   A      The information would be given to them by the
11          monitoring center.
12   Q      Okay.  When these occasions would arise where you
13          would switch the ankle or the leg that has got the
14          device, what is causing the discomfort or the pain?
15          Do you know what was causing it?
16   A      The biggest complaint would be that it was rubbing
17          on their skin or causing irritation to their skin.
18   Q      What on the device has actual direct contact with
19          the skin?
20   A      The band and the back of the device itself.
21   Q      What is it made out of?
22   A      Rubber and plastic.
23   Q      All right.  Do you know whether it is -- how it --
24          what affect it might have on moisture being
25          released from the skin?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | When you say other devices might be used as a |
| 3 | | replacement, what other devices? |
| 4 | A | It would be just -- it would be the same device, |
| 5 | | the ET-1, it would just be a different one, and it |
| 6 | | would be replaced. |
| 7 | Q | So there would be no physical difference between |
| 8 | | the one model and the next one? |
| 9 | A | Correct. |
| 10 | Q | Have you received complaints from the persons -- |
| 11 | | the registrants you were responsible for regarding |
| 12 | | their experiencing any social embarrassment by |
| 13 | | having the devices on their legs? |
| 14 | A | Yes. |
| 15 | Q | What kinds? |
| 16 | A | I had some complaints that registrants didn't want |
| 17 | | the general public seeing the bracelet. |
| 18 | Q | And when did you understand that would occur or |
| 19 | | might occur? |
| 20 | A | For example, if they were wearing shorts. |
| 21 | Q | Is there any way for registrants to be wearing |
| 22 | | shorts and for the device not it be open to public |
| 23 | | view? |
| 24 | A | I don't know. |
| 25 | Q | Would seem not; wouldn't it? |

1 A Yes.
2 Q In some of the materials, I think it is Exhibit 8,
3 I saw that this device has a capacity of generating
4 audio communications. Are you aware of that?
5 A Yes.
6 Q Is that audio communication capability, was that in
7 use for your registrants?
8 A Yes.
9 Q Were people complaining of social embarrassment
10 that might occur when some sort of broadcast comes
11 in?
12 A I don't remember that complaint, no.
13 Q Do you know the extent to which the audio
14 communication could be heard by other people?
15 A No.
16 Q Again, were those kinds of complaints likely
17 recorded by you in your logs or chronologies?
18 A Not necessarily.
19 Q What was done to resolve those complaints, then,
20 about audio communications?
21 A I don't recall getting any complaints about audio
22 communications.
23 Q I am sorry. I misunderstood.
24 I am now putting Exhibit 13 before
25 you. In the note box second from the top on the

1       first page for August 17, 2010, there is a
2       reference to "TotalAccess."  What is TotalAccess?
3   A   That is the name of the computer program, if you
4       will, that we use in the monitoring center.
5   Q   And have any of the exhibits today been generated
6       through TotalAccess?
7   A   Yes.
8   Q   Which ones?
9   A   Well, actually, I will revise that.  No.  I don't
10      believe so.  This may have.  I don't know if they
11      came directly from BI or if it was generated
12      through TotalAccess, our computer program.  I don't
13      know on that one.
14  Q   Okay.  So TotalAccess is a computer program within
15      the Department of Corrections?
16  A   TotalAccess is our monitoring -- electronic
17      monitoring computer program that is used by the
18      monitoring center.
19  Q   Okay.  And would -- is that the system for
20      recording any of the monitoring center alerts and
21      contacts?
22  A   Yes.
23  Q   Were you asked to provide that for us?
24  A   No.
25  Q   Okay.  Do you expect that there must be TotalAccess

1 data collected with regard to Michael Belleau?
2 A Yes.
3 Q Keeping your Exhibit 13 in front of you, there is
4 references here to GPS points, I assume that means
5 global positioning system. And the word "points"
6 is referring to what?
7 A Points are generated approximately every minute by
8 the GPS tracker.
9 Q So again, I think we have talked about this
10 already, but the system, in other words, keeps
11 minute-by-minute track of the physical location of,
12 in your experience, the registrants that you have
13 responsibility for?
14 A Approximate minute by minute, yes.
15 Q What does it mean, for example, on Exhibit 13, when
16 it says they checked the GPS points?
17 A What dates?
18 Q August 17, 2010, at the top.
19 A That means an operator looked in TotalAccess under
20 Michael Belleau and looked at his generated points.
21 Q So you could use TotalAccess to know where
22 Mr. Belleau is; is that the idea?
23 A Yes.
24 MR. DUPUIS: If you had TotalAccess
25 right now, you could find out where he is right

1        now?
2                    THE WITNESS:  Yes.
3   BY MR. WALRATH:
4   Q    At the last page of Exhibit 13, the last entry
5        relates to December 1, 2013.  Do you see that?
6   A    I am sorry.  What is the date?
7   Q    I have December 1, 2013.
8   A    Oh, yes.  Sorry.  Yes.
9   Q    This relates to a, as it says, "Tracker Strap
10       Tamper Event"; correct?
11  A    Yes.
12  Q    And that is also referenced in Exhibit 7 in Page
13       DOC 000157.  Is that correct?  I am pointing in
14       that direction.
15  A    Yes.
16  Q    Now, as I recall, your testimony was that none of
17       these would be false alerts; correct?
18  A    Correct.
19  Q    But isn't the entry here indicating that, in fact,
20       it was a false alert?
21  A    No.
22  Q    How do you understand the entry -- the offender did
23       not appear to tamper with the unit?  What does that
24       mean then?
25  A    The alerts are not false because there is an event

```
 1        to the tracker, there is an event to the bracelet.
 2        So that part is not false.
 3                        It appears that there was some type
 4        of alert and that the police -- per procedure, the
 5        police went to check on Mr. Belleau and looked at
 6        his bracelet and determined that he did not tamper
 7        with it or attempt to remove it.
 8   Q    Is that because there were no marks on it?  How do
 9        you make that determination?
10   A    I don't know.  It would vary by the police officer.
11   Q    This is an example of when an alert went out and a
12        police contact was generated, meaning a contact by
13        the police with Mr. Belleau, when it turned out
14        there was no basis for the tracker strap tamper
15        alert; correct?
16   A    There was an event to the bracelet.
17   Q    But there were no facts to support the event, in
18        other words?
19   A    No.  There was no sign that Mr. Belleau
20        intentionally tampered or marked his bracelet in
21        any way.
22   Q    So the BI system, in other words, in your
23        experience, never sends out signals or alerts that
24        are factually baseless; correct?
25   A    Correct.  There is always an event to the bracelet
```

```
 1  STATE OF WISCONSIN )
                       ) SS
 2  MADISON COUNTY     )

 3          I, Rachel M. Davis, CSR, Certified and Notary

 4  Public in and for the State of Wisconsin, do hereby

 5  certify that the preceding deposition was recorded by me

 6  and reduced to writing under my personal direction.

 7          I further certify that said deposition was

 8  taken before me at WISCONSIN DEPARTMENT OF JUSTICE, 17

 9  West Main Street, Madison, Wisconsin, on the 25th day of

10  September, 2014, commencing at 8:38 a.m. and concluding

11  at 12:08 p.m.

12          I further certify that I am not a relative or

13  employee or attorney or counsel of any of the parties,

14  or a relative or employee of such attorney or counsel,

15  or financially interested directly or indirectly in this

16  action.

17          In witness whereof, I have hereunto set my

18  hand and affixed my seal of office at Madison,

19  Wisconsin, on this 1st day of October, 2014.

20

21                         _____
                           Rachel M. Davis, CSR - Notary Public
22                         In and for the State of Wisconsin

23                         My commission expires July 08, 2018.

24

25
```